## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN DUFFEY, | : | |
| | : | |
| Petitioner, | : | 3:94-cv-1947 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| JEFFREY BEARD, *et al.*, | : | |
| | : | |
| Respondents. | : | |

## MEMORANDUM

### September 12, 2011

## I.    INTRODUCTION

This matter is before the Court on the petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 of Steven Duffey ("Duffey").[1]  Duffey seeks relief from his convictions for first degree murder and related robbery charge and sentence to death, imposed by the Court of Common Pleas of Lackawanna County, Pennsylvania ("trial court").  For the reasons set forth below, the petition shall be denied.

---

[1]This case was initially assigned to Judge Thomas I. Vanaskie.  On July 28, 2010, the case was reassigned to Judge John E.  Jones, III as a result of Judge Vanaskie's elevation to the Third Circuit Court of Appeals.

## II.    FACTS AND PROCEDURAL HISTORY

Following a jury trial in February of 1985, Duffey was convicted of first degree murder[2] and robbery[3] in the death of Kathy Kurmchak.  The Pennsylvania Supreme Court summarized the relevant facts of the proseucution in *Commonwealth v. Duffey*, 548 A.2d 1178 (Pa. 1988) ("*Duffey-I*") and they shall not be repeated here save for when relevant to our analysis.  Following deliberations, the jury found one aggravating circumstance; that Duffey committed a killing while in the perpetration of a felony.[4]  Four mitigating circumstances were proffered by the defense:  (1) Duffey was under the influence of extreme mental or emotional disturbance; (2) Duffey's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired; (3) Duffey's age at the time of the crime; and (4) any other evidence of mitigation concerning his character, his record and the circumstances of his offense.[5]  The verdict slip did not indicate which mitigating circumstances were found, only that the aggravating circumstance outweighed any mitigating circumstances.  State Court Record ("SCR") 83 (Verdict Form).

Following the trial and post trial motions, the trial court appointed new counsel

---

[2] 18 Pa.C.S. § 2502(a)
[3] 18 Pa.C.S. § 3701
[4] 42 Pa.C.S. § 9711(d)(6)
[5] 42 Pa.C.S. § 9711(e)(2), (3), (4) and (8) respectively

to Duffey for the appellate stage and the case proceeded to the Pennsylvania Supreme Court for automatic review.[6]   The Pennsylvania Supreme Court denied Duffey's appeal in 1988.  Further, the Pennsylvania Supreme Court conducted a proportionality review and determined that the jury found one aggravating circumstance and no mitigating circumstances in this case; therefore, a death sentence was properly imposed.[7]  Judgment of the sentence of death entered by the trial court was affirmed. *Duffey-I*.  No further activity occurred in any court on this case until late 1994.

On September 22, 1994, the Governor of the Commonwealth of Pennsylvania signed a death warrant scheduling Duffey's execution for the week of December 4, 1994.   Duffey filed a *pro se* motion for stay of execution in order to permit counsel to be appointed for him and a Post Conviction Relief Act ("PCRA") petition to be filed.  After an arduous and convoluted process through the Pennsylvania and Federal Courts, the case was remanded back to the PCRA Court for a review of the PCRA petition on the merits.[8]

Duffey raised several issues concerning trial and sentencing errors in his

---

[6] 42 Pa.C.S. §9711(h)(1)

[7] This was later corrected to reflect that the aggravating circumstance outweighed the mitigating circumstances, not "no mitigating circumstance" as incorrectly cited by the court on direct review. *Commonwealth v. Duffey*, 889 A.2d 56, 72 (Pa. 2005) ("*Duffey-III*").

[8] A detailed outline of the procedural history of the case can be found at *Commonwealth v. Duffey*, 855 A.2d 764 (Pa. 2004) ("*Duffey-II*").

Amended PCRA petition. Ultimately, the PCRA Court denied his Amended PCRA petition.  Duffey timely appealed to the Pennsylvania Supreme Court.

In 2004, the Pennsylvania Supreme Court made several findings as to trial phase claims in Duffey's Amended PCRA appeal.[9]  However, the Court did not have enough information in the record to rule on the sentencing phase claims.  While maintaining jurisdiction, the Pennsylvania Supreme Court remanded the case back to the PCRA Court with specific instructions.  *Duffey-II*.  The PCRA Court made several findings and returned the case for disposition.  Ultimately, the Pennsylvania Supreme Court denied relief on all claims.  *Duffey-III*.

Duffey filed the instant Amended Petition for Writ of *Habeas Corpus* in 2006. (Dkt 91).  Respondents filed a motion for an order to dismiss Duffey's amended petition.[10] (Dkt 96).  Duffey then filed his memorandum of law.  (Dkt 117).

---

[9] The *Duffey-II* Court found:  1.  Petitioner preserved for review a layered claim of ineffective assistance of counsel;  2.  Trial counsel was not deficient in failing to challenge juror who expressed belief in use of death penalty against murderers (Fagerlin);  3.  Trial counsel was not deficient for failing to object to dismissal of jurors who expressed opposition to death penalty (Walters, Judge and Ruth);  4.  Psychiatrist's testimony regarding defendant's silence in psychiatric examination violated defendant's due process rights (Hume Claim); and  5.  Petitioner was entitled to hearing on his claim that trial counsel was deficient in failing to object to reference to defendant's silence (Hume Claim).

[10] In response to Respondent's Motion to Dismiss at Dkt 96, the court construed the motion as a Response to Amended Petition for Writ of *Habeas Corpus*.  Additionally, Respondents' Brief in Support of their Motion to Dismiss (Dkt 99) was construed as a Brief in Support of Response to Amended Petition for Writ of *Habeas Corpus*. *See* Dkt 124.  As to Respondent's Motion to Dismiss at Dkt 96, in as much as it has not been formally addressed, Respondent's motion is hereby DENIED.

Respondents filed a response to the memorandum in 2007.  (Dkt 122).  Duffey filed

a reply memorandum of law.  (Dkt 123).  This matter is now ripe for disposition.

## III.    STANDARD OF REVIEW

A *habeas corpus* petition is the proper mechanism for a prisoner to challenge

the "fact or duration" of his confinement pursuant to 28 U.S.C. § 2254.  *Preiser v.*

*Rodriguez*, 411 U.S. 475, 498-99 (1973).  "[I]t is not the province of federal *habeas*

court to reexamine state-court determinations on state-law questions."  *Estelle v.*

*McGuire*, 502 U.S. 62, 67-68 (1991).  Rather, federal *habeas* review is restricted to

claims based "on the ground that [petitioner] is in custody in violation of the

Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *Estelle,*

502 U.S. at 67-68; *see also Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Johnson v.*

*Rosemeyer*, 117 F.3d 104 (3d Cir. 1997).

It is also "well settled that the fact that constitutional error occurred in the

proceedings that led to a state-court conviction may not alone be sufficient reason for

concluding that a prisoner is entitled to the remedy of *habeas*."  *Williams v. Taylor*,

529 U.S. 362, 407 (2000) (internal citations omitted).  "On the other hand, errors that

undermine the confidence in the fundamental fairness of the state adjudication

certainly justify the issuance of a federal writ."  *Id.*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L.

No. 104-132, 110 Stat. 1214 (1996), went into effect on April 24, 1996 and amended the standards for reviewing state court adjudications in federal *habeas* petitions filed under 28 U.S.C. § 2254.   Duffey filed his first petition in 1997.   After filing this petition, Duffey asked for, and was subsequently granted, a stay of the federal proceedings while he pursued exhaustion of his state court remedies.   After exhausting his state court remedies in 2006,  Duffey returned to this court and filed an Amended Petition for Writ of *Habeas Corpus*.   Since Duffey's petition was filed after the effective date of the AEDPA, this Court is required to apply the amended standards to his claims for federal *habeas corpus* relief.   *See Werts v. Vaughn*, 228 F.3d 178, 195 (3rd Cir. 2000) (citing *Lindh v. Murphy*, 521 U.S. 320, 336 (1997)).

## A.  Exhaustion

Under the AEDPA, a federal court cannot consider a writ of *habeas corpus* unless the petitioner has first exhausted all state court remedies, there is an absence of available state corrective process, or circumstances exist that render such process ineffective to protect the rights of the petitioner.   *See* 28 U.S.C. §2254(b)(1).   The exhaustion requirement is not a mere formality.   It serves the interests of comity between federal and state systems by allowing the state an initial opportunity to determine and correct any violation of a prisoner's federal rights.   *Crews v. Horn*, 360 F.3d 146, 151 (3d Cir. 2004).

This statutory provision has been interpreted to require the federal *habeas* petitioner to present both the facts and legal theory associated with each claim through "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-845 (1999); *Holloway v. Horn*, 355 F.3d 707, 714 (3d Cir. 2004). In addition, the state court must be put on notice that a federal claim is being asserted. *Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001). To satisfy this requirement, a petitioner must demonstrate that the claim raised was fairly presented to the state's highest court, either on direct appeal or in a state post-conviction proceeding. In the matter *sub judice*, Duffey has exhausted all of his claims in the Pennsylvania Supreme Court in *Duffey-II* and *Duffey-III*.

### B. Merits

Once it is established that the *habeas* claims have been exhausted and are not procedurally defaulted, a federal court may reach the merits of a *habeas corpus* petition. The AEDPA restricts a federal court's authority to grant relief when a state court has previously considered and rejected the petitioner's federal constitutional claims on the merits, unless the state adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the Untied States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  We will more fully describe these alternative touchstones in turn.

### (1)  Contrary to / Unreasonable Application of Federal Law

The Supreme Court first interpreted the standard set forth in §2254(d)(1) in *Williams v. Taylor*, supra.  The Court instructed that federal courts must first decide exactly what constitutes the applicable clearly established law determined by the Supreme Court.  *Id.* at 389-91; *see also Hameen v. State of Delaware*, 212 F.3d 226, 235 (3d Cir. 2000).  Next, the federal court must determine whether the state court's decision was "contrary to" or "an unreasonable application of" that law.  28 U.S.C. § 2254(d)(1).

"[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to the Court's holdings, as opposed to dicta, and applies as of the time of the relevant state court decision.  *Williams*, 529 U.S. at 412.  The Third Circuit has held that a federal court's analysis of whether a state court's decision is "contrary to" or an "unreasonable application of" Supreme Court precedent under § 2254 (d) may be amplified by decisions of inferior federal courts evaluating that Supreme Court precedent.  *Hardcastle v. Horn*, 368 F.3d 246, 256 n.3 (3d Cir. 2004) (citing *Matteo v. Superintendent*, 171 F.3d 877, 890 (3d Cir. 1999).

The AEDPA "directs federal courts to attend to every state court judgment with

utmost care, but it does not require them to defer to the opinion of every reasonable state court judge on the content of federal law.  If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody – or. . . his sentence of death – violates the Constitution, that independent judgment should prevail." *Williams*, 529 U.S. at 415-16.

To establish that the state court decision was contrary to federal law, "it is not sufficient for the petitioner to show merely that his interpretation of the Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome." *Matteo*, 171 F.3d at 888.  Additionally, a federal court will only find a state court decision to be an unreasonable application of federal law if the decision, "evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Id.* at 890.

"An unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, 529 U.S. at 410.  "A federal *habeas* court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, that application must be "objectively unreasonable." *Id.*  Thus, the AEDPA imposes a "highly deferential standard for

evaluating state-court rulings," *Lindh*, 521 U.S. at 333 n.7, and "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*).

When assessing whether a state court's application of federal law is unreasonable, "the range of reasonable judgment can depend in part on the nature of the relevant rule" that the state court must apply. *Renico v. Lett*, 130 S.Ct. 1855, 2010 U.S. LEXIS 3675 (2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Because the AEDPA authorizes federal courts to grant relief only when state courts act unreasonably, it follows that the more general the rule at issue, the greater the reasoned disagreement among fair-minded judges will occur, the more leeway the state courts have in reaching outcomes in case-by-case determinations. *Renico*, 130 S. Ct. at 19. Whether the trial judge was right or wrong is not the pertinent question under the AEDPA, it is whether the decision was reasonable. The "AEDPA prevents defendants – and federal courts – from using federal *habeas corpus* review as a vehicle to second-guess the reasonable decisions of state courts." *Id.* at 25.

"Under the 'contrary to' clause, a federal *habeas* court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-

10

413. "Under the 'unreasonable application' clause, a federal *habeas* court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

### (2)    Unreasonable Determination of Facts

A federal court may also grant relief under § 2254(d)(2) where the state court's decision is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

A factual determination should be adjudged "unreasonable" under § 2254(d)(2) only if the court finds that a rational jurist could not reach the same finding on the basis of the evidence in the record. *Porter v. Horn*, 276 F.Supp 2d 278, 296 (E.D. Pa. 2003); *see also Torres v. Prunty*, 223 F.3d 1103, 1107-08 (9th Cir. 2000); *cf. Jackson v. Virginia*, 443 U.S. 307 (1979). "This provision essentially requires the district court to step into the shoes of an appellate tribunal, examining the record below to ascertain whether sufficient evidence existed to support the findings of fact material to the conviction." *Breighner v. Chesney*, 301 F. Supp 2d 354, 364 (M.D. Pa. 2004) (citing 28 U.S.C. § 2254 (d)(2) and (f)). Mere disagreement with an inferential leap or credibility judgment of the state court is insufficient to permit relief. *Porter*, 276 F. Supp. 2d at 296; *see also Williams*, 529 U.S. at 410; *Hurtado v. Tucker*, 245 F.3d 7,

11

16 (1st Cir. 2001).  Only when the finding lacks evidentiary support in the state court record, or is plainly controverted by evidence therein, should the federal *habeas* court overturn a state court's factual determination.  *Porter*, 276 F. Supp. 2d at 296; *see also Williams*, 529 U.S. at 408-10.

The standard set forth in 28 U.S.C. § 2254(d)(2) should not be confused with the standard in § 2254(e).  Section 2254(d) dictates the terms under which a federal court will grant relief while § 2254(e) deals with a standard of proof.  Under 28 U.S.C. § 2254(e)(1), a federal court is required to presume that a state court's findings of fact are correct and the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence.  The clear and convincing evidence standard as found in § 2254(e)(1) only pertains to state-court determinations of factual issues, rather than decisions.  *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions); *Matteo*, 171 F.3d at 888; *Thomas v. Varner*, 428 F.3d 491, 497-98 (3d Cir. 2005).  Although § 2254(e)(1) has a heightened standard of clear and convincing evidence for reviewing factual determinations, this standard is not insurmountable. The Supreme Court has stated:

> Even in the context of federal *habeas*, deference does not imply the abandonment or abdication of judicial review.  Deference does not by

definition preclude relief.  A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

*Miller-El*, 537 U.S. at 340 (2003); *see also Wiggins v. Smith*, 539 U.S. 510, 528 (2003) (rejecting state court's factual determination under § 2254(e)(1) and § 2254(d)(2)).

## IV.  DISCUSSION

Duffey's *habeas* petition contains nine claims with many sub-claims that deal with ineffectiveness of trial counsel and direct appellate counsel.  For clarity and purposes of discussion, the Court will address Duffey's claims in the order presented in his petition; first setting forth the standard for effective assistance of counsel, since it is involved as either a primary or secondary issue in many of Duffey's claims. Other standards will be presented when that particular issue is addressed, as needed.

## CLAIM I:  Petitioner's death sentence should be vacated because counsel was ineffective at capital sentencing

The Sixth Amendment guarantees criminal defendants the "effective assistance of counsel," which is representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).  The benchmark for judging any claim of ineffectiveness must

be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland*, 466 U.S. at 686.

In *Strickland,* the United States Supreme Court established the federal standard for ineffective assistance claims. In the two prong test established by the Court, a defendant's claim of counsel's ineffectiveness must first establish that the attorney's representation was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. If this is established, the defendant must then show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious that defendant was deprived of a fair trial. *Strickland*, 466 U.S. at 687. Unless a defendant meets both of these requirements, it cannot be argued that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. *Id.* The focus of the inquiry must be on the fundamental fairness of the proceeding. There is no need to approach the ineffectiveness claim in a particular manner since insufficiency to either prong defeats the entire claim. Therefore, if it is easier to dispose of the claim with no prejudice, then that course should be followed. *Id.* at 697.

The proper standard by which to measure attorney performance remains reasonableness under prevailing professional norms. *Id.* at 688. This standard is a general one. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688-698. The Supreme Court has recognized the American Bar Association standards and restatements of professional standards as "guides" as to what is reasonable, but they are "only guides" to the extent they describe the professional norms prevailing when the representation took place. *Id.* at 688. These guides should not be so detailed that they "interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id.* at 689. Nor shall these guides be an exhaustive list of obligations of counsel or a checklist for judicial evaluation of attorney performance. *Id.* The inquiry remains whether counsel's assistance was reasonable considering all of the circumstances. *Id.* at 687.

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was

unreasonable." *Id.* at 689 citing *Engle v. Isaac*, 456 U.S. 107, 133-134 (1982). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689. The presumption can be rebutted by showing "that the conduct was not, in fact, part of a strategy or by showing that the strategy employed was unsound." *Thomas v. Varner*, 428 F.3d 491, 499-500 (3d Cir. 2005).

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in the light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as

elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.  At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment...  [A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution...It is not enough for the defendant to show that the error had some conceivable effect on the outcome of the proceeding.  Virtually every act or omission of counsel would meet that test and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding...The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 691-694.

"When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.  When challenging a death sentence, as in this case,

the question is whether there is a reasonable probability that, absent the errors, the sentencer –to include an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.

Although the Supreme Court decided *Strickland* in 1984, the same year as Duffey's trial and sentencing, this Court applies *Strickland* as the benchmark for assessing trial counsel's performance; by 1983, "all the Federal Courts of Appeals . . . held, the proper standard for attorney performance is that of reasonably effective assistance," which is the standard that *Strickland* reiterated. *Morris v. Beard*, 2007 U.S. Dist. LEXIS 44707 (E.D. Pa. June 20, 2007) citing *Strickland*, 466 U.S. at 687.

**Pennsylvania Law**

Under Pennsylvania law, a three-prong test is utilized for ineffective assistance of counsel claims, but it is, in effect, identical to *Strickland*. *Commonwealth v. Pierce*, 527 A.2d 973, 976 (Pa. 1987). Under the *Pierce* test, a defendant must show 1) that the claim has arguable merit; 2) that counsel lacked a reasonable basis for his or her chosen course; and 3) that the petitioner was prejudiced thereby. *Id.* at 975. The Third Circuit has held that Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to *Strickland*. *Jacobs v. Horn*, 395 F.3d 92, 107 n.9 (3d Cir. 2005); *Werts v. Vaughn*, 228 F.3d at 204 (3d Cir. 2000). Thus, under 28 U.S.C.

§ 2254(d)(1), the relevant inquiry in assessing ineffectiveness claims that have been adjudicated on the merits, is whether the state court's decision involved an unreasonable application of *Strickland* and further, under 28 U.S.C. § 2254(d)(2), whether the petitioner received constitutionally effective counsel. *Bond v. Beard*, 539 F.3d 256, 279 (3d Cir. 2008).

### Professional norms

Under *Strickland*, this Court's first function is to identify the prevailing professional norms that existed at the time of Duffey's trial and sentencing, determine whether trial counsel's conduct fell below these norms and, if so, whether the petitioner suffered prejudice thereby.

The American Bar Association ("ABA") standards in effect during Duffey's 1984 trial described defense counsel's duty to investigate both the merits and mitigating circumstances in general terms: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." ABA Standards for Criminal Justice 4-4.1 at 4-53 (2d ed. 1980) ("1980 ABA Standards"). The two page commentary noted defense counsel's role in regard to mitigating factors that "[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationship,

and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id.* at 4-55.

The first ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases was published in 1989, five years after Duffey's conviction ("1989 ABA Guidelines"). The guide was updated in 2003 to reflect the sweeping changes to federal *habeas corpus* laws with the enactment of the AEDPA. ("2003 ABA Guidelines"). In the 2003 revision, the ABA compiled a team of experts to evaluate standards, review best practices and identify necessary revisions.[11] Notably, the 2003 ABA Guidelines consists of 131 pages of substance, a stark contrast to the standards applied in the mid-1980s when Duffey was convicted. "Judging counsel's conduct in the 1980's on the basis of the 2003 ABA Guidelines, without even pausing to consider whether they reflected the prevailing professional practice at the time of the trial, is error." *Bobby v. Van Hook*, 130 S. Ct. 13, 17, 2009 U.S. LEXIS 7976 (2009). Therefore, we will use the 1980 ABA Standards and the 1989 ABA

---

[11] When compiling the 2003 ABA Guidelines, the "team of experts" gathered, included representatives from the following ABA sections: Criminal Justice, Litigation, Individual Rights and Responsibilities, Legal Aid and Indigent Defendants, ABA Special Committee on Death Penalty Representation; and the following non-ABA entities: National Association of Criminal Defense Lawyers, National Legal Aid and Defender Association, Federal Death Penalty Resource Counsel, Habeas Assistance and Training Counsel, State Capital Defenders Association and expert capital litigators. 2003 ABA Guidelines Introduction ii. Despite this impressive array of entities, the Guidelines are only that, not inexorable dictates which counsel must fully comply. *See Strickland*, 466 U.S. at 688 (ABA standards and the like are only guides to what reasonableness means, not its definition.)

Guidelines as more appropriate guides representative of reasonable performance of counsel at the time of Duffey's trial.[12]

The aforementioned 1989 ABA Guidelines gives us a more detailed view of acceptable attorney norms at the time of Duffey's trial and expands the short commentary noted in the 1980 ABA Standards.  Under the 1989 ABA Guidelines, counsel representing a defendant faced with the death penalty had a duty to ensure that all reasonably available mitigating evidence was presented to the jury in the most effective possible way.  1989 ABA Guidelines, 11.8.2(D).  Preparation for the sentencing phase was to begin immediately upon counsel's entry into the case, and the preparation was to include thorough discussions with the client about the penalty strategy.  Counsel should have prepared by investigating the following witnesses and evidence: (1) witnesses familiar with and evidence relating to the client's life and development, from birth to the time of sentencing, who would be favorable to the client; (2) expert witnesses to provide medical, psychological, sociological or other explanations for the offense for which the client was being sentenced, to give a favorable opinion as to the client's capacity for rehabilitation, etc.; (3) witnesses with knowledge and opinions about the lack of effectiveness of the death penalty itself; and

---

[12] *Cf. Haliym v. Mitchell*, 492 F.3d 680, 717 n.28 (6th Cir. 2007) (applying 1989 and 2003 Guidelines to petitioner's case which was tried in 1983) and *Marshall v. Cathel*, 428 F.3d 452 (3d Cir. 2005) (applying ABA Guidelines to petitioner's case that was tried in 1986.)

(4) witnesses drawn from the victim's family or intimates who would be willing to speak against killing the client. *Wiggins*, 539 U.S. at 524 (citing 1989 ABA Guideline 11.8.3. and 11.8.6.)

In Duffey's case, the Pennsylvania Supreme Court affirmed the PCRA Court's conclusion that trial counsel's actions were reasonable. Since the deferential AEDPA standard of review applies, our task is to address whether the Pennsylvania Supreme Court unreasonably applied *Strickland* when it decided that Duffey received constitutionally effective counsel. *Bond*, 539 F.3d at 280. Having articulated the general standards for ineffectiveness claims, we now turn to applying those standards to the facts in the matter *sub judice*.

### *Claim I.B.*[13]   *Counsel's Failure to Investigate, Develop and Present Mitigating Evidence*

As previously noted, Duffey claims his death sentence should be vacated because his trial counsel provided ineffective assistance at capital sentencing. Duffey contends that counsel failed to adequately establish his poverty-stricken childhood, including his exposure to toxic chemicals, the extreme mental and physical abuse he suffered at the hands of his father, his poor performance at school, and the

---

[13] Paragraph A under Claim I is a listing of Relevant Evidence. (Dkt 91 at 4). The first sub-claim under Claim I is at paragraph B. (*Id.* at 31). For clarity, the lettering of the sub-claims follows Petitioner's Amended Petition for Writ of *Habeas Corpus*. (Dkt 91).

development of his mental and emotional disorders.    Accordingly, Duffey's ineffectiveness claim has several sub-parts and they will be addressed in order.

### *(1) Childhood Exposure to Toxic Substances*

Duffey argues that trial counsel failed to uncover information related to the fact that he lived in an EPA Superfund area from the ages three to nine.  The site was declared a Superfund area in 1983 and was known to contain toxic elements, including lead.  Duffey cites the 2003 ABA Guidelines in support of his argument that a reasonable attorney would have uncovered this information.  (2003 ABA Guideline 11.8.6.(B) (counsel should investigate client's "medical history" and "social history," including "neighborhood surroundings," and prepare "expert testimony" concerning these matters.))

**State Court**

The PCRA Court concluded that Duffey's claim failed since he never established whether the facts and circumstances to be investigated were within counsel's knowledge.  The Pennsylvania Supreme Court agreed.  *Duffey-III* at 64. The Court found there was no reason for counsel to conceive that Duffey had ever been exposed to lead, other than the fact that Duffey lived in a town that was declared to be a Superfund site in 1983.  *Id.*

Further, there was no evidence to suggest that any of Duffey's family knew at the time of trial that he had been exposed to lead or other toxins. There were no childhood medical records documenting that Duffey had been exposed to lead, or that he had high levels of lead in his blood. Even as late as the PCRA hearing (15 years after his trial), it was unclear whether the technology existed at the time of trial which would have established Duffey's claim of childhood exposure to lead. *See* SCR 145 at 180-2 (Tr. of PCRA, Dec. 13, 1999). Specifically, expert testimony was presented by Dr. Rosen during cross-examination indicating that testing Duffey's blood for lead in 1984 could not establish how much lead was from his exposure to the Superfund site, and that current technology for assessing past lead exposure was unavailable in the U.S. in 1984. *Duffey-III* at 64-65.

**Analysis**

While as noted Duffey tries to rely on the 2003 ABA Guidelines, he fails to show any authority to support his contention that investigating "neighborhood surroundings" reflected the prevailing professional practice at the time of his trial. Without such authority, it would be error to hold his counsel to the 2003 ABA Guidelines in this respect. *See Van Hook*, supra.

Evidence of Duffey's exposure to lead is speculative at best. If current counsel cannot show that trial counsel knew or should have known of this mitigating evidence,

24

then trial counsel cannot be found ineffective for failing to present it to the court. Duffey's trial counsel undertook sufficient efforts to investigate and procure mitigating evidence. This search did not produce evidence of any lead exposures by Duffey as a child. We find that trial counsel's efforts were entirely reasonable. *See* 1989 ABA Guidelines 11.8.6. Trial counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland* at 689. Therefore this sub-part of Claim I.B. fails.

### (2) Family Witnesses

Duffey acknowledges that trial counsel offered family witnesses in an effort to mitigate; however, he challenges the quality and quantity of this evidence. At the penalty phase, trial counsel presented the testimony of Duffey's mother, sister and a school counselor showing his childhood history in support of the catchall mitigator.[14] Duffey's mother testified to the family's financial circumstances and the physical abuse perpetrated by Duffey's father. SCR 89 at 137-140 (Tr. of Penalty Phase, Feb. 7, 1985). She gave specific examples of the abuse and testified that Duffey "got the worst of it." *Id.* at 141. Further, she testified about the physical traumas that Duffey suffered as well as seizures he began to have at age nine. *Id.* at 145-147. Duffey's sister also offered testimony regarding the abuse inflicted by the father, and also

---

[14] 42 Pa.C.S. § 9711(e)(8) any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

reiterated that Duffey sustained the worst of it. *Id.* at 152. The school counselor presented various school records that supported his testimony that Duffey performed poorly in school, had both academic and disciplinary problems at school, and had received mental health counseling which he was encouraged to continue "because of the difficulties he was experiencing." *Id.* at 58.

**State Court**

The PCRA Court concluded that trial counsel presented adequate testimony regarding Duffey's childhood. Here again, the Pennsylvania Supreme Court agreed. *Duffey-III* at 66. The Court noted that Duffey did not suggest that alternative evidence could have been presented in support of the mitigating factor, but merely asserted that more evidence of his dysfunctional childhood could have been offered. *Id.*

**Analysis**

While not cited in *Duffey-II* or *Duffey-III*, Pennsylvania has consistently held that failure to present cumulative evidence is not ineffective assistance of counsel. *Commonwealth v. Gorby*, 900 A.2d 346 (Pa. 2006); *Commonwealth v. Hall*, 701 A.2d 190 (Pa. 1997); *Commonwealth v. Cross*, 634 A.2d 173 (Pa. 1993); *see also Cruz v. McGrady*, 2010 U.S. Dist. LEXIS 125123 (E.D. Pa. 2010); *see also Van Hook*, 130 S. Ct. at 19. It is well settled that the weighing of mitigating circumstances is a qualitative and not quantitative procedure. *Commonwealth v. Dennis Miller*, 724

A.2d 895 (Pa. 1999), cert. denied, 528 U.S. 903 (1999); *see also Commonwealth v. Kenneth Miller*, 819 A.2d 504, 518-19 (Pa. 2002)*; Commonwealth v. Brown*, 648 A.2d 1177, 1186 (Pa. 1994) (balancing aggravating against mitigating circumstances is not a quantitative process--that is, if more aggravating than mitigating circumstances are found, the jury is not required to impose a death sentence; likewise, if more mitigating than aggravating circumstances are found, the jury is not necessarily precluded from imposing a death sentence.")  Since Duffey has failed to demonstrate that trial counsel was ineffective for failing to present what would clearly have been cumulative evidence, we find no reason to question the Pennsylvania Supreme Court's denial of this claim.  Accordingly, this sub-claim fails.

### *(3) The documented history of mental impairments and the relationship between the history of abuse and mental deficiency and Duffey's behavior*

Duffey contends that trial counsel failed to make a sufficient causal connection between his history of abuse, his mental deficiency and his behavior.  Duffey claims that if the causal ties were adequately presented and explained to the jury, this would have given the jury substantial mitigation to outweigh the aggravation.  Additionally, Duffey argues that he suffered from organic brain damage and that there was significant evidence to support such a diagnosis at the time of the penalty hearing.  At the PCRA hearing, Duffey presented extensive expert testimony in support of his contention of brain damage, mental illness, psychological deficiencies, physical abuse

and intellectual impairment.  Duffey does not argue that trial counsel failed to present this information, but rather, that the testimony, as offered, was ineffective.  Duffey claims his trial counsel should have presented more evidence relating to the circumstances he faced while growing up.

### State Court

 Trial counsel offered the testimony of four experts in support of two mental health mitigators.[15]  Two of the doctors testified as to Duffey's seizure disorder and the other two doctors testified as to Duffey's mental health.  Both of the mental health experts acknowledged the possibility that Duffey suffered from some type of organic brain disorder, but their testimony focused largely on Duffey's antisocial personality disorder.  *Duffey-III* at 67; *see* SCR 89 at 78-79 (Tr. of Penalty Phase, Feb. 2, 1985). (Dr. Brennan testifying that he diagnosed Duffey with organic personality syndrome or disorder) *id.* at 83; (Dr. Lesniak stating that there was a possibility of organic impairment.)  *Id.* at 162.

Dr. Brennan utilized Duffey's childhood history in formulating his diagnosis, acknowledging that there was evidence of abuse, learning problems, disciplinary problems and epilepsy.  *Id.* at 158-59.  He also reviewed the facts in Duffey's case,

---

[15] 42 Pa.C.S. § 9711(e)(2) (the defendant was under the influence of extreme mental or emotional disturbance) and 42 Pa.C.S. § 9711(e)(3) (the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.)

supporting materials, and the statutes regarding aggravating and mitigating circumstances.  Dr. Brennan informed trial counsel that he could diagnose Duffey with organic brain syndrome, but ultimately said it [organic brain syndrome] would not help at all.  SCR 151 at 68 (Tr. of PCRA, Dec. 17, 1999).  Dr. Brennan further explained that he felt the proper diagnosis was "personality disorder, antisocial personality."  *Id.* At 69.  Counsel discussed Duffey's diagnosis with Dr. Brennan and how the abuse Duffey suffered affected him.

Based on his discussions with the experts, it was trial counsel's belief that he had to focus on the antisocial personality diagnosis since it gave him a way to "back door an additional element of Duffey's mental capacity."  *Id.* at 79.  The PCRA Court credited trial counsel's testimony and ultimately concluded that "the fact that the appellant had found experts who now claim he has brain damage does not negate the fact that his trial counsel investigated his cognitive abilities and discussed it with the trial experts."  *Duffey-III* at 67-68.

The PCRA Court concluded that trial counsel presented adequate testimony of Duffey's childhood.  Once again, the Pennsylvania Supreme Court agreed.  *Duffey-III* at 66.  The PCRA Court further concluded that counsel effectuated a reasonable trial strategy in presenting mental health evidence, a determination with which the Pennsylvania Supreme Court also agreed.  *Id.*

The Pennsylvania Supreme Court ultimately concluded that sufficient evidence was presented in regard to mitigating factors including information regarding Duffey's background, education, employment record, mental and emotional stability, and family relationship. *Id.* Trial counsel investigated and presented evidence of Duffey's familial situation, including the abuse he suffered as a child, his medical issues, which included traumas and mental health issues, and finally, his educational struggles. Because it was evident that there were potential mental health issues, trial counsel began investigating those issues very early on in the representation[16].

**Analysis**

Trial counsel relied on the reports and conversations he had with the four experts who testified on Duffey's behalf.  Defense counsel was not ineffective for relying on the opinions of these experts.  *Clark v. Mitchell*, 425 F.3d 270 (6th Cir. 2005).  Further, by utilizing defense experts, trial counsel was acting in conformity with the ABA Guidelines.  *Id.* at 286 n.5.

"Investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524

---

[16] Demonstrating support for trial counsel's focus and early consideration of this issue, the second entry on the Court of Common Pleas docket is a Petition for the Appointment of Psychiatric Expert and Private Investigator.  The first entry is a Petition for the Appointment of Counsel.

(quoting 1989 ABA Guidelines Section 11.4.1(c)), at 93 (emphasis omitted). *Strickland* announced that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.   In *Wiggins*, the Supreme Court elaborated on an attorney's duty to investigate. 539 U.S. at 523. The Court  explained that the relevant inquiry is "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable." *Id.* Moreover, "in assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527.

Presenting cumulative evidence, or evidence that Duffey now claims would have made a stronger case, does not rise to the level of ineffectiveness.  In *Hedrick v. True*, the Fourth Circuit concluded that "even though the trial counsel did not uncover and present all evidence of Hedrick's family history of drug and alcohol abuse, incompetent parenting, and his mother's criminal record (welfare fraud), this did not arise to the level of ineffective assistance of counsel.  443 F.3d 342, 351 (4th Cir. 2006).  There "comes a point at which evidence ... can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Van*

31

*Hook*, 130 S. Ct. at 19.  As with *Strickland* and *Van Hook*, trial counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments." *Van Hook* quoting *Strickland*, 466 U.S. at 699.

This is not a case in which the Duffey's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, *cf. Wiggins*, 539 U.S. at 525, or would have been apparent from documents any reasonable attorney would have obtained, *cf. Rompilla v. Beard*, 545 U.S. 374, 389-393 (2005).  Instead, it is analogous to *Strickland*, where defense counsel's decision not to seek *more* mitigating evidence was reasonable.

Duffey's counsel acted well within reasonable professional bounds as set by the Supreme Court of the United States.  Therefore, the Pennsylvania Supreme Court's decision is not contrary to, or an unreasonable application of, clearly established federal law in this sub-claim, and therefore it fails.

### Claim I.C.  Counsel Elicitation of Prejudicial and Misleading Testimony from his own Witness

Trial counsel called Thomas Gilhooley, a prison social worker, to testify during the penalty phase.  Gilhooley testified that Duffey told him details of the murder, and then Gilhooley described those details in his testimony.  Duffey contends that calling Gilhooley to testify further inflamed the jury with gruesome details of the murder.

32

Duffey believes Gilhooley's testimony further undermined his defense by negating mental health mitigation.

**State Court**

Trial counsel was able to articulate his reasoning for calling Gilhooley and how that testimony supported his trial strategy.  The PCRA Court credited trial counsel's testimony, concluding that counsel acted in his client's best interest since he used Gilhooley's testimony to raise questions about Duffey's mental state.  *Duffey-III* at 69. The Pennsylvania Supreme Court agreed with the PCRA Court, concluding "counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests."  *Id.* citing *Kenneth Miller*, 819 A.2d at 517.

**Analysis**

Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.  *Strickland*, 466 U.S. at 690.   As stated earlier, it is easy to second-guess counsel's strategy after it has proved unsuccessful.  *Id.* at 466 U.S. at 689.   Trial counsel used Gilhooley's testimony to support his overarching trial strategy.   Gilhooley was called as a defense witness

33

during the sentencing hearing. At that point, the jury had already heard Duffey's multiple confessions and had already found him guilty of murder. Trial counsel believed that Gilhooley could provide beneficial testimony as to Duffey's mental health while his testimony on Duffey's confession would be negligible. SCR 151 at 126-128 (Tr. of PCRA, Dec. 17, 1999). Specifically, trial counsel used Gilhooley's testimony to counter the Commonwealth's argument that Duffey killed the victim because he did not want to go back to jail. Trial counsel's position was that if Duffey did not want to return to jail, he would not have confessed six times (one of those times to Gilhooley) in such a short time after the murder. *Id.* at 133.

Trial counsel also used Gilhooley's testimony to show Duffey's confused mental state. Gilhooley had issued a report describing Duffey's irrational behavior, hallucinations and voices he was hearing prior to the murder. *Id.* at 124, 126 and 128. This report helped to support trial counsel's strategy to create reasonable doubt as to Duffey's mental health that he could not obtain from the mental health experts appointed to the case. *Id.* at 127-128 and 131.

Trial counsel's actions had a reasonable basis designed to effectuate his client's interests. Duffey has failed to show that trial counsel's strategy was unsound. *Thomas v. Varner*, 428 F.3d at 499-500. Counsel's conduct fell within the wide range of reasonable professional assistance. The Pennsylvania Supreme Court reasonably

34

applied clearly established federal law when making this decision.  Accordingly, this sub-claim fails.

### *Claim I.D.  Counsel's Failure to Rebut Prosecutor's Case for Death*

Duffey claims counsel was ineffective for failing to counter the prosecution's elicitation of harmful testimony regarding Duffey's brain damage.  Specifically, Dr. Hume testified that Duffey had a "normal" EEG and CAT scan in 1985 indicating that his brain was functioning "normally."  Dr.  Rosenblatt said the EEG he performed detected "no seizure disorder."  Trial counsel did not elicit testimony that Duffey was taking anti-seizure medication which would explain the "normal" results of the EEG.

**State Court**

The brain damage argument is largely based on the availability of mental health evidence at the time of trial.  At the PCRA hearing, Duffey presented extensive expert testimony to support his contention that evidence existed at the time of the penalty phase hearing to show that he suffered from organic brain damage and that it was exacerbated by the abuse he suffered.  However, the record indicates that trial counsel investigated the possible mental health mitigators, met with defense experts and together, developed the strategy used.  As stated earlier, the Pennsylvania Supreme Court credited counsel's testimony and concluded that trial counsel's strategy during

closing arguments was to highlight the mental health issues and that this strategy was reasonable.  *Duffey-III*, at 69.

**Analysis**

This claim falls within the previous argument which we addressed in sub-claim I.B. regarding Duffey's mental health.  The litany of evidence that Duffey argues should have been included to rebut the prosecution's case relative to brain damage was in fact presented at sentencing.  Again, we find that trial counsel appropriately relied on his expert witnesses in evaluating Duffey's mental health.  Because trial counsel's conduct falls within the wide range of reasonable professional assistance under *Strickland*, the Pennsylvania State Court did not unreasonably apply clearly established federal law.  Therefore, the state court decision will not be disturbed and this sub-claim fails.

*Claim I.E.  Counsel's Prejudicial Closing Arguments*

Duffey next claims that trial counsel's statements during closing arguments were weak, ineffective and harmful in that they portrayed Duffey as a "frightening, anti-social person without a conscience, whose behavior was unexplainable."  Duffey goes so far as to accuse trial counsel of acting as a "second prosecutor."

**State Court**

The PCRA Court credited trial counsel's testimony that he focused on highlighting the mental health issues presented during the sentencing hearing. The Pennsylvania Supreme Court agreed with the PCRA Court, stating that Duffey "takes these comments out of context, and when read in context, it is clear that counsel was attempting to communicate to the jury that [Duffey] had a personality disorder and that the personality disorder made him act impulsively." *Duffey-III* at 69. Furthermore, counsel argued that jail was the best place for Duffey and that the death penalty was not going to deter others. *Id.* The Pennsylvania Supreme Court found this strategy to be reasonable.

**Analysis**

We reiterate that strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *Strickland*, 466 U.S. at 690. Trial counsel, as guided by his mental health experts, reasonably presented the facts of the case and the defense's theme to the jury (one that paints Duffey as unable to control his conduct due to the mitigators presented and that jail was the only place for him). We find this strategy to be well within the reasonable behavior expected of counsel, and the Pennsylvania Supreme Court was not

unreasonable applying *Strickland* to their finding on this claim.  For these reasons, this sub-claim also fails.

### Claim I.F.  Appellate Counsel's Ineffectiveness

Duffey claims appellate counsel was ineffective for failing to raise the various claims he has presented in Claim I.  Duffey alleges direct appeal counsel never even read the transcript from the penalty phase and, therefore, failed to raise any of the Claim I issues presented at sentencing on direct appeal.

**State Court**

The Pennsylvania Supreme Court addressed this as a layered claim of ineffectiveness (i.e., trial counsel erred in his performance and then appellate counsel erred in not raising trial counsel's errors).   In assessing this layered ineffectiveness claim as to appellate counsel, the Pennsylvania Supreme Court first looked at trial counsel's actions.  Since the Pennsylvania Supreme Court found no error in trial counsel's performance, no error could be assigned to appellate counsel.

**Analysis**

In assessing this sub-claim, a layered ineffectiveness claim as to appellate counsel, we must, as the Pennsylvania Supreme Court did, first look at trial counsel's actions.   If there is no ineffective assistance of trial counsel, there can be no

38

ineffective assistance of appellate counsel for failure to raise the same issue. *Jones v. Barnes,* 463 U.S. 745 (1983). We have heretofore addressed the individual issues Duffey raised in this claim. The Pennsylvania Supreme Court found no error by trial counsel and we have found that decision to be reasonable.

Since there is no merit in this claim of ineffective assistance of trial counsel, direct appellate counsel cannot be found ineffective for failing to raise those same meritless issues on appeal. *Showers v. Beard*, 586 F. Supp. 2d 310, 322 (citing *United States v. Cook*, 45 F.3d 388, 392-93 (10th Cir. 1995)*; see also Commonwealth v. McGill*, 832 A.2d 1014 (Pa. 2003). (If there is no ineffective assistance of trial counsel, there can be no ineffective assistance of appellate counsel, i.e. the court must first address the claim of trial counsel's conduct, since it is only if trial counsel was ineffective that the remaining prongs related to appellate counsel's conduct need to be addressed.)

**CLAIM II:   Petitioner's death sentence should be vacated because the Commonwealth presented harmful testimony and argument concerning his silence at a psychiatric examination, after promising him his silence would not be used against him.  ("Hume Claim"[17])**

---

[17]       As this claim has been commonly referred to as the "Hume Claim" by the Pennsylvania courts and the parties to this action, we will do the same.

Duffey next claims that his Fifth and Sixth Amendment protections were violated when his silence was used against him to obtain a death sentence after he was assured that he could exercise his right to silence without it being used against him. Duffey relies on *Doyle v. Ohio* for the proposition that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter breach that promise by using the silence to impeach his testimony. *Doyle v. Ohio*, 426 U.S. 610 (1976). He also relies on *Wainwright v. Greenfield*, 474 U.S. 284 (1986), which extends *Doyle* and states that the use of a defendant's post-*Miranda*[18] warnings silence to rebut a mental health defense violates due process.

Duffey also contends that the prosecutor used Dr. Hume's testimony concerning his silence during closing arguments to support the Commonwealth's position that Duffey could control his actions and that he chose to commit the crimes, as opposed to Duffey's mitigating claim that he could not conform his conduct to the law.

**State Court**

In anticipation of defense counsel's consideration of an insanity defense, the Commonwealth retained Dr. Hume, a psychiatrist. Prior to trial, Dr. Hume evaluated Duffey. It is of significant note that both of Duffey's counsel were present at this evaluation. At the beginning of the interview, Dr. Hume advised Duffey:

---

[18]     *Miranda v. Arizona*, 384 U.S. 436 (1966)

> I've been requested to interview you regarding your mental status by the District Attorney and anything that you might say to me might very well end up in a report to the District Attorney, and as you're aware everything that's being said here is transcribed.

SCR 81 at 2.  (Tr.  of Psychiatric Examination, Jan. 25, 1985).   Hume then gave

Duffey the following admonition:

> Your rights permit you to refuse to answer any questions you might choose to so if something comes up that you don't want to respond to, that's your perfect right and that doesn't necessarily draw any particular inferences or not.

*Id.*   During the interview, Duffey answered some, but not all of the questions

presented to him by Dr. Hume; at times remaining silent following questions.

During the sentencing phase, Duffey did not present an insanity defense, but he

did present mental health evidence in mitigation.   This evidence included the

argument that his capacity to appreciate the criminality of his conduct or to conform

his conduct to the requirements of the law was substantially impaired.  42 Pa.C.S. §

9711(e)(3).  The Commonwealth called Dr. Hume in rebuttal.  Trial counsel objected

to Dr. Hume's testimony by way of pre-trial and pre-penalty phase objections, all of

which were overruled.  *Duffey-III* at 61-62.  Dr. Hume testified that Duffey had the

capacity to make voluntary choices and that he was able to control his impulses and

behavior.  Dr. Hume engaged in the following exchange with the prosecutor:

> Hume:       Even in the examination that I did, there were some questions which he declined to answer relating to his

41

> mental capacity, his cognitive abilities for which there are
> no particular reason that he could not or should not have
> answered them.  He simply chose not to.

Prosecutor: That indicates what, Doctor?

Hume:   A voluntary decision not to in that part of the exam to
answer the questions.

SCR 89 at 209-210.  (Tr.  of Penalty Phase, Feb.  7, 1985).  This exchange followed

15 pages of examination in which Dr.  Hume reviewed the evidence he evaluated, his

diagnosis of Duffey with an anti-social personality disorder, and the many examples

supporting his opinion that Duffey could control his behavior and actions.  (i.e.,

Duffey was able to follow the police from his home to the police station, he was able

to follow directions to the bathroom, he knew right from wrong.[19])

The second part of Duffey's Claim II challenges the prosecutor's comments

regarding Dr. Hume's testimony in his closing argument.  The pertinent portion of his

comments include:

> Capacity is not the same as I want to do it but I can't.  It's saying, does he have
> the ability to make the choice?  Is that ability to make the choice impaired?

---

[19] Dr. Hume:   What's wrong with murder?
Duffey:    What's wrong with murder?
Dr. Hume:   Um-hum.
Duffey:    What do you mean?  It's against the law, sure, if that's - - it ain't
right.
Dr. Hume:   How about robbery?
Duffey:    That ain't right, either.  It's against the law.
SCR 81 at 18-20.  (Tr. of Psychiatric Examination, Jan.  25, 1985).

That is the key question, not whether he did or he didn't, one way or the other, but is that ability, that cognitive ability impaired?

The answer has been - - The only answer that we received here, the only person that's answered that question from that stand has been Dr. Hume.  And he said, no.  He has the capacity to conform his conduct to the requirements of the law.

SCR 89 at 243.  (Tr.  of Penalty Phase, Feb.  7, 1985).

In *Duffey-II*, the Pennsylvania Supreme Court determined that Duffey's claim of ineffective assistance of counsel had arguable merit.  *Duffey-II* at 775.   However, the Court could not rule on the claim of ineffective assistance of trial and appellate counsel without knowing if Duffey's trial counsel had a reasonable basis for his actions.  Thus the issue was remanded to the PCRA Court with instructions to evaluate the reasonableness of the trial and appellate counsel's actions.

The PCRA Court held an evidentiary hearing and made findings regarding counsel's conduct.  Specifically, the PCRA Court found that the constitutional claim was preserved by trial counsel's *general objections* to Dr. Hume's testimony and that trial counsel had a reasonable basis for his actions.  The PCRA Court also credited counsel for making a conscious decision not to continue to object because he was trying to maintain his credibility with the jury and did not want to draw more attention to Dr. Hume's testimony.  Further, trial counsel believed he could use the testimony regarding Duffey's silence to his advantage because Dr. Hume's testimony was

43

consistent with trial counsel's argument that Duffey had such limited mental capabilities that he was incapable of answering some of Dr. Hume's questions. Again, the PCRA Court credited trial counsel with having a reasonable basis for the strategy he pursued regarding Dr. Hume's testimony. SCR 160 at 158-161. (Tr. of Remand, Nov. 18, 2004).

After finding that trial counsel was effective, the PCRA Court then analyzed direct appeal counsel's conduct independently (as opposed to a layered claim as presented in the petition and as directed by the Pennsylvania Supreme Court in *Duffey-II*). The PCRA Court found that Duffey presented sufficient evidence to establish that direct appeal counsel was ineffective for failing to pursue the Hume Claim on appeal. SCR 160 at 161-162. (Tr. of Remand, Nov. 18, 2004)*; see also Duffey-III* at 63.

The Pennsylvania Supreme Court affirmed the PCRA Court's finding that trial counsel was effective, concluding that the factual finding that trial counsel's strategy had some reasonable basis designed to effectuate his client's interests was supported by the record. *Duffey-III* at 63. However, the Supreme Court did not agree with the PCRA Court's conclusion regarding appellate counsel; specifically, that the claim was presented as a layered ineffectiveness claim not a stand alone claim. The court found that by the very nature of being a layered claim, if there was no merit in the claim of

44

ineffective assistance of trial counsel, appellate counsel cannot be found ineffective for failing to raise those same issues on appeal. *See Showers v. Beard*; *United States v. Cook*; and *Commonwealth v. McGill*, supra. The Pennsylvania Supreme Court found thus no merit to the claim of ineffective assistance of direct appeal counsel.

Duffey also argued that the PCRA Court's determination that direct appeal counsel was ineffective was proper because it found that trial counsel preserved the issues related to Dr. Hume's testimony. *Duffey-III* at 63 n.4. In its oral recitation of the findings of fact, the PCRA Court emphasized that trial counsel had "preserved" the issue related to Dr. Hume's testimony by making general objections to his testimony. *Id.*

However, the Pennsylvania Supreme Court pointed out that Duffey ignored the fact that the PCRA Court's finding that trial counsel preserved this issue was as to Dr. Hume's testimony generally, and did not relate to the specific constitutional error of commenting on Duffey's silence that the Pennsylvania Supreme Court discussed in *Duffey-II*. *Duffey-III* at 63 n.4. In order to have preserved that specific issue, an objection had to have been made as to the specific comment on silence, not Dr. Hume's testimony in general.

Alternatively, Duffey argued that even if the PCRA Court's findings regarding trial counsel were correct, direct appeal counsel should have raised this claim as a

45

claim of trial court error under the then-applicable relaxed waiver doctrine. The Court observed that with the discretionary nature of Pennsylvania's relaxed waiver doctrine, there was no guarantee that the Court would have analyzed this issue in any event. *See Commonwealth v. Freeman*, 827 A.2d 385, 400 n.9 (2003). *Duffey-III* at 63.

**Analysis**

Duffey's reliance on *Doyle v. Ohio* and *Wainwright v. Greenfield* are misplaced. Both of these cases deal with the state's comments on the defendant's post-arrest, post-*Miranda* silence. In *Doyle*, the state attempted to use Doyle's post-*Miranda* silence against him in rebuttal to his alibi. In *Wainwright*, the state tried to rebut Wainwright's claim of not guilty by reason on insanity by showing he was sane enough to understand the *Miranda* warnings by remaining silent.

In the present case, Duffey is not complaining of comments made as to his silence during police questioning in a post-arrest, post-*Miranda* setting. Duffey's case is more analogous to the circumstances and reasoning of *Estelle v. Smith*, 451 U.S. 454 (1981) and its progeny. A defendant subjected to a post-indictment competency evaluation will have the benefit of advice from his attorney, which may not be the case in a police interrogation. *Estelle*, 451 U.S. at 475-476. Therefore we reject Duffey's reliance on *Doyle* and *Wainwright* and will analyze this claim under *Estelle* and its progeny.

46

In *Estelle*, the state judge ordered a capital defendant to undergo a psychiatric examination by a state-retained doctor. The defendant did not offer a defense of mental infirmity at the guilt phase. However, during the penalty phase, the state sought to offer the doctor's testimony as to proof of defendant's future dangerousness.

The Supreme Court granted habeas relief because it determined that the Fifth and Sixth Amendments (through the Fourteenth) applied at the penalty phase. Estelle's interview had been compelled, no notice was made to defense counsel; and no *Miranda* warnings had been given. The *Estelle* Court expressly observed that before interrogation the state must provide the defendant "with an awareness of the Fifth Amendment privilege and the consequences of forgoing it." 451 U.S. at 467.

The *Estelle* Court emphasized two distinct elements of its conclusion: the state court compelled the defendant to submit to the examination and the defendant himself never placed his mental state in issue at either the guilt or penalty phase of the trial. 451 U.S. at 468.

The Supreme Court, soon thereafter, addressed a case where the aforesaid two elements were not present in *Buchanan v. Kentucky*, 483 U.S. 402 (1987). In *Buchanan*, the defendant's counsel and prosecutor jointly petitioned the state court to order a psychiatric examination to see if the defendant should be treated during

incarceration.   At trial, the defendant raised a defense of extreme emotional disturbance and the court allowed the prosecutor to use the resulting psychiatric report to rebut the defense.

The *Buchanan* Court distinguished *Estelle*, suggesting that "if a defendant requests [a psychiatric evaluation] or presents psychiatric evidence, then at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." *Buchanan*, 483 U.S. at 422-23.  Since the defense counsel in *Buchanan* sought the examination and then placed defendant's mental state in issue, there was no constitutional violation when the state offered the examination for the "limited rebuttal purpose."  *Id.* at 424.

The Supreme Court further clarified the holding in *Estelle* and *Buchanan* in two more cases, *Satterwhite v. Texas*, 486 U.S. 249 (1988) and *Powell v. Texas*, 492 U.S. 680 (1989).  In *Satterwhite*, the state offered penalty phase evidence from a compelled psychiatric examination of the defendant even though the defendant did not put his psychological state in issue.   The Court determined that since the examination occurred after indictment, and without proper notice to defense counsel, there was a Sixth Amendment violation.  *Satterwhite*, 486 U.S. at 255-56.  In *Powell*, the state examined the defendant and offered the psychiatric report at the penalty phase.  The state contended that since the defendant raised his mental state during the guilty phase,

there was no violation of *Estelle*.   The Court held that while initiation of the psychiatric issue at trial by the defense could waive a Fifth Amendment objection against self incrimination, the introduction of such evidence did not waive the Sixth Amendment protection of the right to consult with counsel.

More recently, the Supreme Court revisited this issue under the AEDPA in *Penry v. Johnson*, 532 U.S. 782 (2001).  Early in 1977, in a non-capital crime, Penry underwent a psychiatric examination requested by defense counsel.  Two years later, in an unrelated incident, Penry was changed with capital murder.  Penry placed his mental state in issue in both his capital and non-capital trials so the state was able to use the voluntary psychiatric report against him.  The Court distinguished *Penry* from *Estelle*.  In *Estelle*, the defendant did not place his mental state in issue; in *Penry*, he did.  Estelle was compelled by the court to undergo a psychiatric examination, in *Penry*, defense counsel requested the examination.  Further, the prosecutor in *Estelle* placed the psychological evidence in its case in chief; in *Penry*, the prosecutor used it for the limited purposes of cross-examination.  *Penry*, 532 U.S. at 794.

To summarize this line of cases, a compelled psychiatric interview implicates Fifth and Sixth Amendment protections (*Estelle*).   The defendant must receive *Miranda* warnings and defense counsel must be notified (*Estelle*).  The warnings must advise the defendant of the consequences of forgoing his right to remain silent

(*Estelle*).   The Fifth and Sixth Amendments do not necessarily attach when the defendant himself initiates the psychiatric examination (*Buchanan*, *Penry*).   The Fifth (but not the Sixth) Amendment rights can be waived when the defendant initiates a trial defense of mental incapacity or disturbance, even though the defendant had not been given *Miranda* warnings (*Buchanan*, *Powell*).   However, that waiver is not limitless, it only allows the prosecution to use the interview to provide rebuttal to the psychiatric defense (*Buchanan*, *Powell*).

At the time of Duffey's trial, the Pennsylvania Supreme Court had established that a defendant could be court ordered to submit to a psychiatric examination but could not be compelled to answer any of the questions at the examination.  *McNeill v. Fulcomer*, 753 F. Supp. 1294, 1297 (1990) (citing *Commonwealth v. Pomponi*, 447 Pa. 154 (1971) and other Pennsylvania Supreme Court cases).  This must be tempered with federal precedent.  Notably in *Estelle,* Chief Justice Burger stated:

> When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that [defendant] interjected into the case. . .  A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding.

*Estelle*, 451 U.S. at 465, 468.

In Duffey's case, the defense gave notice of insanity or mental infirmity

defense[20].  In response, the court ordered the defendant to submit to a psychiatric examination by a psychiatrist for the Commonwealth.  By doing so, the protections of the Fifth and Sixth Amendment were provided in accordance with *Estelle*, supra. Furthermore, Duffey was then on notice that if he offered psychiatric testimony at trial or sentencing, the Commonwealth would be able to present the evidence it obtained in rebuttal at the same.

Dr. Hume clearly indicated to Duffey that the interview was being recorded and that anything Duffey said was being preserved on the record, that what he said could be used against him in court, and that if he chose not to answer questions negative inferences would not necessarily be made.  SCR 81 at 2.  (Tr.  of Psychiatric Evaluation, Jan 25, 1985).

The following exchange makes it clear that Duffey understood the consequences about which he was warned.  Moreover, Duffey was made aware that the evaluation was being transcribed, and that anything he said (and implicitly, his silence) could be used against him:

Dr. Hume:    If you had three wishes, what would they be?

---

[20]     Pa.R.Crim.P. 305 C(1)(b) provides in part:

Notice of Insanity or Mental Infirmity Defense: A defendant who intends to offer at trial the defense of insanity, or a claim of mental infirmity, shall, at the time required for filing an omnibus pretrial motion under Rule 306, file of record notice signed by the defendant or the attorney for the defendant, with proof of service upon the attorney for the Commonwealth, specifying intention to claim such defense.

Duffey:      I don't want to say them.  I got three but I ain't going to say them
             or I would say to my lawyers.  I would tell them but not in front
             of everybody on the record, you know.

SCR 81 at 18.  (Tr. of Psychiatric Examination, Jan. 25, 1985).

Since Duffey initiated the mental-status defense, he waived his right to raise a

Fifth Amendment challenge to the prosecution's limited use of psychiatric evidence

in rebuttal.  While not at direct issue here, since Duffey's Fifth and Sixth Amendment

protections were provided to him and he waived his Fifth Amendment protection, the

prosecution arguably could have used the psychiatric evidence even if Duffey had not

initiated its use.  Lastly, Duffey's Sixth Amendment protections were met since both

of his counsel had notice and were present for Dr. Hume's interview.  *See Estelle*, 451

U.S. at 469 (psychiatric evidence could be used by the state only if the defendant had

been apprised of his rights and had knowingly decided to waive them.)  Therefore,

Duffey's rights were not violated by Dr. Hume's testimony.

As to closing arguments, at no time did the prosecutor specifically refer to

Duffey's silence.  The prosecutor made reference to Dr. Hume's testimony in general

and the many factors Dr. Hume testified to.  The prosecutor commented on Dr.

Hume's diagnosis and opinion that Duffey was capable of making voluntary choices

and that he could control his behavior.  Dr. Hume's opinion was based on all of his

testimony, not just limited to his comment on Duffey's refusal to answer some

52

questions.  Further, since Dr. Hume's testimony did not violate Duffey's rights, neither would the prosecutor's comments on that testimony violate Duffey's rights. Due to the shear volume of evidence against Duffey, and the relatively *de minimus* referral to his silence as a supporting factor in Dr. Hume's opinion that Duffey had the ability to choose his actions, any error that may have occurred, did not prejudice Duffey.   See *Strickland*, 466 U.S. at 696 (a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.)

We find that the Pennsylvania Supreme Court reasonably applied *Strickland* as to trial counsel and we will not disturb this decision under the deferential standard of the AEDPA.   *See* 28 U.S.C. § 2254(d)(1)-(2).   Further, upon our analysis of the protections afforded Duffey under the Fifth and Sixth Amendments, we find that Duffey's rights were not violated.  Therefore, his trial counsel was not ineffective for failing to object to comments regarding Duffey's silence during Dr. Hume's examination.  Since the underlying claim does not violate Duffey's rights and his trial counsel was effective, appellate counsel cannot be held ineffective.  Accordingly, this

claim fails.

**CLAIM III**: **Duffey's death sentence should be vacated because the penalty-phase jury instructions suggested that the jury must unanimously find a mitigating circumstance before giving it effect.**

Duffey next claims that his death sentence should be vacated because the penalty phase jury instructions suggested that the jury must unanimously find a mitigating circumstance before giving it effect in the sentencing decision.  Duffey contends that the sentencing phase jury instruction violated his Eighth and Fourteenth Amendment rights based on the decision in *Mills v. Maryland*, 486 U.S. 367 (1988).[21]

**State Court**

The Pennsylvania Supreme Court relied on *Commonwealth v. Cox* to deny Duffey's claim. In the Court's own words:

> As we recently explained in *Commonwealth v. Cox,* 581 Pa. 107, 863 A.2d 536, 554 (Pa. 2004), an alleged *Mills* violation will not be available on collateral review in cases in which the alleged error occurred before the United States Supreme Court's decision in *Mills*. In this case, the allegedly erroneous instruction was given in 1985, well before the Court's decision in *Mills*. This court affirmed Appellant's conviction on direct appeal on October 14, 1988, which was after the High Court's decision in *Mills*. Appellant, however, never raised or preserved a *Mills* claim before the trial court or on

---

[21]     In short, *Mills* states that jurors must be able to consider all mitigating evidence in a death penalty case and that if there is a substantial probability that jurors were under the impression that they could not consider mitigating factors unless the jury unanimously agreed on them, the death penalty cannot be imposed.

54

>     direct appeal. As such, Appellant's claim regarding Mills is waived.
>     *Cox, supra.*

*Duffy III* at 71. Duffey attempted to overcome his waiver issue by raising a layered

claim of ineffective counsel. The *Duffy III* court concluded that "[t]rial counsel,

however, will not be deemed ineffective for failing to anticipate a change in the

law . . . [a]ccordingly, trial counsel was not ineffective for failing to anticipate the

*Mills* decision, and thus, Appellant's layered claim necessarily fails." *Id.*

**Analysis**

As noted above, the AEDPA prohibits a federal district court from issuing a

writ of habeas corpus pursuant to a judgment of a state court unless the state court

proceedings

>     (1) resulted in a decision that was contrary to, or involved an
>     unreasonable application of, clearly established Federal law, as
>     determined by the Supreme Court of the United States; or (2) resulted
>     in a decision that was based on an unreasonable determination of the
>     facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Once a new constitutional rule is declared, judicial integrity requires the

application of the new rule to all similar cases pending on direct review. *Teague v.*

*Lane*, 489 U.S. 288, 304 (1989).  However, as a general rule, cases on collateral

review cannot take advantage of these new rules.  Under *Teague*, "federal habeas

corpus petitioners may not avail themselves of new rules of criminal procedure

outside two narrow exceptions[22] . . . *Mills* announced a new rule that does not fall within either of *Teague*'s exceptions." *Beard v. Banks*, 542 U.S. 406, 408 (2004). Based on *Teague*, the holding in *Mills* is not available to Duffey on collateral review.

The *Mills* opinion was handed down in June 1988 while Duffey's case was still pending on direct review. The Pennsylvania Supreme Court affirmed Duffey's conviction in October 1988, a few months after *Mills* was announced. Whether *Mills* should have been applied to Duffey's direct review between June and October 1988 need not be decided by this Court because, for the reasons that follow, even if *Mills* was applied, the penalty phase jury instructions in the case at bar did not violate *Mills*.[23]

---

[22]     The first exception to the *Teague* rule permits the retroactive application of a new rule if the rule places a class of private conduct beyond the power of the State to proscribe or addresses a 'substantive categorical guarantee accorded by the Constitution,' such as a rule 'prohibiting a certain category of punishment for a class of defendants because of their status or offense.' The second exception is for 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding. *Teague*, 489 U.S. at 311.

[23]     It is interesting to note that in *Beard v. Banks*, a majority of the United States Supreme Court commented "[a]lthough nothing in this case turns on it, we note that it is arguable that the "*Mills* rule" did not fully emerge until the Court issued *McKoy*" in 1990. *Beard* at 413 n. 4. As *McKoy* was decided in 1990, after Duffey's conviction was affirmed on direct review, if the *Mills rule* did not truly emerge until the *McKoy* decision, Duffey would not have been able to take advantage of *Mills*.

There is also some uncertainty as to whether *Mills* sets forth pertinent "clearly established Federal law" for reviewing the state court ruling on this claim. *See Smith v. Spisak*, 130 S.Ct. 676, 681 (2010);  compare *Williams v. Taylor*, 529 U.S. 362, 390 (2000) (Stevens, J., for the Court) (applicable date for purposes of determining whether "Federal law" is "established" is when the "state-court conviction became final"), with *id.* at 412, (O'Connor, J.,

In *Mills*, the Court vacated a petitioner's death sentence because there was "a substantial probability that reasonable jurors, upon receiving the judge's instructions in [the] case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular . . . circumstance." *Mills* at 384. In *McKoy v. North Carolina,* 494 U.S. 433 (1990), the State had statutorily required unanimity of both aggravating and mitigating circumstances in death penalty deliberations.   In vacating the petitioner's death sentence , the *McKoy* Court held that the state's unanimity requirement impermissibly limited the jurors' consideration of mitigating evidence. *Id.*

Under our jurisprudence, "in a capital case 'the sentencer [may] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Mills v. Maryland*, 486 U.S. 367, 374 (1988) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)). It is on this specific point where the *Mills* instructions ran contrary to the United States Constitution.

In *Mills*, the verdict form stated:

_____

for the Court) (applicable date is "the time of the relevant state-court decision").

> . . . we *unanimously* find that each of the following mitigating
> circumstances . . . has been proven to exist by a preponderance
> of the evidence . . .

*Mills*, 486 U.S. at 387 (emphasis added). A natural reading of this verdict form required all 12 jurors to agree on the existence of a mitigating circumstance before it could be considered. So, if even one of the jurors believed the mitigating circumstance did not exist, none of the jurors could consider it. The problem this language created was that if one aggravating circumstance was proved, one juror could prevent the entire jury from considering any mitigating evidence and the defendant would be sentenced to death. *Id.* at 380-381. Because the instructions in *Mills* could have led a reasonable juror to believe they could not consider mitigating evidence unless they unanimously agreed to its existence, the court held that the instructions violated the Constitution. *Id.* at 374-75.

By contrast, the instructions and verdict form in *McKoy* expressly limited the jury's consideration to only those mitigating circumstances that were unanimously found. 494 U.S. at 444, n.8. It was not until *McKoy* that the Supreme Court announced that a state's "unanimity requirement impermissibly limits jurors' consideration of mitigating evidence and hence is contrary to our decision in *Mills*." *Id.* at 444.

The Pennsylvania Sentencing Code in effect at the time of Duffey's trial, required juries to unanimously agree upon the existence of aggravating circumstances before they could be given effect.   It was only after these aggravating circumstances were unanimously agreed upon that they were to be weighed against any mitigating circumstance(s).  42 Pa.C.S. § 9711 (1980).  The Pennsylvania Code *did not* require unanimity as to mitigating circumstances.   This allowed jurors to place the weight they individually believed should be given to mitigating evidence.   Only then did the Code require unanimity in the ultimate decision of whether the aggravating circumstances outweighed the mitigating circumstances.

The standard to be used in further analyzing Duffey's *Mills/McKoy* claim is outlined in *Boyde v. California*:

> We think the proper inquiry in such a case is whether there is a *reasonable likelihood* that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.  Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a *possibility* of such an inhibition . . . There is . . . a strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation. Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense

> understanding of the instructions in the light of all that has taken place
> at the trial likely to prevail over technical hairsplitting.

*Boyde v. California*, 494 U.S. 370, 380-381 (1990) (emphasis added).

Our analysis would be incomplete if we did not address the recent decision in *Abu-Jamal v. Sec'y Pa. Dep't of Corr.*, No. 01-9014, __ F.3d __, 2008 U.S. App. LEXIS 28098 (3d Cir.  Apr 26, 2011).  In *Abu-Jamal*, the Third Circuit held that the verdict form and jury instructions in that case created a *substantial probability* the jury believed it was precluded from finding a mitigating circumstance that had not been unanimously agreed upon.  *Id.* at 13 (emphasis added).  On certiorari, the Supreme Court directed the Third Circuit to reconsider their holding in light of the Court's recent decision in *Smith v. Spisak*, 130 S. Ct. 676 (2010).[24]  After analysis, the Third Circuit again found *Abu-Jamal*'s facts to be

---

[24]      In *Spisak*, the Supreme Court unanimously ruled that the instructions and verdict forms provided to the jury *did not* clearly bring about a substantial possibility that reasonable jurors may have thought they were precluded from consideration of mitigating evidence unless all 12 jurors unanimously agreed on the mitigating circumstances. In *Spisak*, the Court ruled the instruction was significantly different from the *Mills* instruction because the *Spisak* judge explained the concept of a "mitigating factor" Furthermore, the Trial judge instructed the jury:

> [Y]ou, the trial jury, must consider all of the relevant evidence raised at trial, the evidence and testimony received in this hearing and the arguments of counsel. From this you must determine whether, beyond a reasonable doubt, the aggravating circumstances, which [Spisak] has been found guilty of committing in the separate counts are sufficient to outweigh the mitigating factors present in this case.

*Spisak* at 683. Neither the judge's jury instructions nor verdict forms indicated that the jury would have to come to a unanimous decision about each individual mitigating factor.

60

materially indistinguishable from those in *Mills* and again determined the Pennsylvania Supreme Court's decision to deny *Abu-Jamal*'s claim to be an unreasonable application of clearly established Federal law. *Abu-Jamal* at 28. The *Abu-Jamal* Court also determined their decision did not run afoul of *Spisak*. *Id.* at 3.[25]

While a Pennsylvania case like *Abu-Jamal*, Duffey's jury form and instructions were different than in *Abu-Jamal*. The jury form in Duffey's case differed significantly from both *Mills* and *McKoy* as well. The pertinent portion of the *Duffey* jury verdict form is as follows:

> WE THE JURY UNANIMOUSLY SENTENCE THE DEFENDANT TO:
>
> __X___ Death
>
> _____ Life imprisonment
>
> (TO BE USED IF THE SENTENCE IS DEATH)
>
> WE THE JURY HAVE FOUND UNANIMOUSLY:
>
> _____ at least one aggravating circumstance and no mitigating circumstance, the aggravating circumstance(s) (is) (are):

---

[25]     In the *Abu-Jamal* jury form, "unanimously" appeared in the same paragraph with both aggravating and mitigating circumstances. *Abu-Jamal* at 13-14. In addition, the jury in Abu-Jamal had to list on the jury form each aggravating and mitigating circumstance that was found. *Id.* Further, the judge's instructions repeatedly called for unanimity. *Id.* at 16-17.

__X___  one  or  more  aggravating  circumstances  which outweigh  any  mitigating  circumstances.  The  aggravating circumstance(s) (is) (~~are~~):

"Murder committed while committing a felony."

*See* SCR 83 (Verdict Form).

The word "unanimously" as used in Duffey's jury form was in reference to the ultimate questions of sentence and the weighing of aggravating and mitigating circumstances.  The instructions given to the jury required aggravating circumstances to be agreed upon unanimously and listed out on the form.  The instructions given to the jury did not require the mitigating circumstances to be agreed upon unanimously or listed on the form.  The fact that the jury "must unanimously agree that the aggravating must outweigh the mitigating is not the same as unanimously agreeing that a mitigating factor exists." *Frey v. Fulcomer*, 132 F.3d 916, 922 (1997) citing *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 308 (1991).  Like the decision in *Zettlemoyer*, the layout and instructions on the verdict form emphasizes that only the jury's ultimate conclusion must be unanimous, not that each interim step in its deliberations must be unanimous.  *Id.*[26]

Moreover, we do not consider the jury form in isolation.  Duffey's case is further  distinguished  from  *Mills*  and  *Abu-Jamal*  when  reviewing  the  verbal

---

[26]   We concede that the jury form could be more pellucid; however, when read as a whole, and then in concert with the jury charge, we do not find it to be constitutionally infirm.

instructions by the judge as well as counsel's closing arguments.  The judges in *Mills* and *Abu-Jamal* both emphasized unanimity.  In *Duffey*, the emphasis was on weighing and considering *all* evidence. Defense counsel repeatedly asked the jury to consider evidence from the entire case in determining the mitigating circumstances. SCR 89 at 221-225.  (Tr. of Penalty Phase, Feb. 7, 1985).[27] The Prosecutor reminded the jury to "follow the evidence wherever it leads you" and to consider all the circumstances. SCR 89 at 236-248.  (Tr. of Penalty Phase, Feb. 7,

---

[27]    Specifically, Defense Counsel stated:
    you cannot return a verdict of death unless, unless the Commonwealth establishes an aggravating circumstance . . . beyond a reasonable doubt . . . if you find mitigating circumstances from the evidence, the evidence we presented and the entire case, and the entire case, because you could consider that, also you could only impose the sentence of death if that aggravating circumstance, if you remember our hands in voir dire, outweighs the mitigating.  If the mitigating outweighs the aggravating, the sentence must be life imprisonment . . . Again, I ask you to take note of the fact you could consider all of the evidence in the case . . . Finally . . . your verdict, whatever it may be, life or death, must be unanimous . . . Now the mitigating circumstances in this case.  First of all, I wish you to consider all of the evidence presented.
SCR 89 at 221-225.  (Tr. of Penalty Phase, Feb. 7, 1985).

1985).[28] The Trial Judge emphasized that *all* evidence about aggravating and mitigating circumstances must be considered.[29]

---

[28]     Specifically, the Prosecutor said:
. . . follow the law and follow the evidence wherever it leads you. . . you follow the evidence. . . if the aggravating outweigh the mitigating, you must impose the death penalty . . . you are to consider all of the evidence in the case . . . [a]ll of those exhibits, all the testimony of all those people, that is all relevant to your deliberations on the death penalty . . . [t]he aggravating circumstance has to outweigh the mitigating circumstance . . . I want a verdict on justice . . . I want you to follow the evidence and follow the law . . . All of the circumstances you must consider, all of them . . . You look at all of the circumstances here . . . I suggest to you that they [the defense] have not established the mitigating circumstances as required here.  And even if they did establish some, the aggravating still outweigh the mitigating.
SCR 89 at 236-248.  (Tr. of Penalty Phase, Feb. 7, 1985).

[29]     In his jury instructions, the Judge told the jury:
You can call upon your good common sense, all of the evidence that was introduced, and, again, the arguments of counsel and the instructions of the Court . . . The crime [*sic*] code provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweighs any mitigating circumstance.  That is what the law provides . . . All the evidence from both sides, including the evidence you heard earlier during the first trial in the case in chief and to aggravating and mitigating circumstances, is important and proper for you to consider . . . Remember and consider all of the evidence, giving it the weight to which it is duly entitled . . . Remember, again, that your verdict must be unanimous.  It cannot be reached by a majority vote or by any other percentage of you.  It must be the verdict of each and every one of you . . . 'We the jury have found unanimously,' and put a check mark if there is at least one aggravating circumstances and no mitigating circumstance. 'The aggravating circumstance is,' and you must state what the aggravating circumstance is.  The second one is one or more aggravating circumstances which outweigh any mitigating circumstance. 'The aggravating circumstances are,' and then you would indicate what the aggravating circumstances are.  Remember, there's only one aggravating circumstance in this case . . . [m]embers of the jury, if after conscientious and thorough deliberations you are unable to agree on your finding and verdict, you should report that to me.  If in my opinion further deliberations will not result in a unanimous agreement on the sentence, it will be my duty then to sentence the defendant to life imprisonment.
SCR 89 at 251-259.  (Tr. of Penalty Phase, Feb. 7, 1985) (emphasis added).

From reviewing the record, it is readily apparent that the judge and counsel repeatedly advised the jury to consider *all* of the evidence presented. The jury was told to take into consideration the statutes as well as their common sense, closing arguments, everything presented in court and that they could give it the weight they believed the evidence dictated.  *Id.* at 251 - 255.  The judge told the jury their *verdict* had to be unanimous and that the *finding of aggravating circumstance* had to be unanimous.  *Id.* at 255-257 (emphasis added).  At no time did the judge require or order that mitigating circumstances be found unanimously.

While Duffey argues that the Third Circuit's *Frey* decision should be controlling in this case, Duffey's case is more analogous to *Spisak*. The instructions in *Spisak* did not say that the jury must determine the existence of each individual mitigating factor unanimously.  The United States Supreme Court wrote in *Spisak*, "[n]either the instructions nor the forms said anything about how - - or even whether - - the jury should make individual determinations that each particularly mitigating circumstance existed.  They focused only on the overall balancing question.  And the instructions repeatedly told the jury to conside[r] all of the relevant evidence."  *Spisak* at 684.

As was the case in *Spisak*, the jury form in Duffey's case did not require the mitigating factors to be found unanimously.  SCR 83 (Verdict Form).  Neither the

instructions nor the forms say anything about how, or whether, the jury should make individual determinations that each mitigating circumstance existed.  *Id.* Additionally, the judge and counsel continually emphasized considering *all* of the evidence.  *See* SCR 89, 221-259.  (Tr. of Penalty Phase, Feb. 7, 1985).

In *Spisak*, the jury had already decided the aggravating circumstances to be proven beyond a reasonable doubt during the trial phase.  The judge instructed the jury that the "aggravating factors they would consider were the specifications that the jury had found proved beyond a reasonable doubt at the guilt phase of the trial."  *Spisak*, 130 S. Ct. at 683.  The judge then explained what a mitigating factor was, listed examples and informed the jury they should consider "any other" mitigating factor.  *Id.*  This was also true for Duffey.  The sole aggravating factor to be considered during Duffey's sentencing was that the murder was committed during the course of a felony.[30]  The judge in Duffey's case pointed this out to the jury as well as identifying all of the mitigating factors put forth by Duffey.  The last mitigating factor was the "catch-all" factor that includes generally anything about the defendant that the jury considers mitigating.

Even assuming that *Mills* sets forth the pertinent "clearly established federal law" for reviewing the state court decision in this case, Duffey has failed to show

---

[30]     Duffey had been convicted of both murder and robbery at trial.

that the *Mills* rule was violated in his case.  Duffey's case differs significantly from those in *Mills, McKoy* and *Abu-Jamal* and is more analogous to *Spisak*.  Like *Spisak,* in *Duffey*, the jury form, counsels' argument and the judge's instructions do not run afoul of the U.S. Constitution.  Moreover, they *did not* create a substantial probability or reasonable likelihood that reasonable jurors would believe that mitigating circumstances must be found unanimously before being considered.  Therefore, we conclude that the state court's decision is not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States in *Mills* and *McKoy*.  28 U.S.C. § 2254(d)(1).  Since Duffey has failed to overcome the standards required by AEDPA, we will not disturb the Pennsylvania Supreme Court's determination.  Consequently, this claim fails.

**CLAIM IV: Petitioner's death sentence should be vacated because the jury was not instructed that the alternative to a death sentence was life without possibility of parole.**

Duffey next claims that because the jury was told that he "has no conscience," "cannot be deterred" or "controlled" and "does not give a damn about punishment" absent an assurance that "life-means-life," this evidence and

argument essentially compelled a death sentence.   Duffey argues that failure to instruct the jury of this violated his due process rights under *Simmons v. South Carolina*, 512 U.S. 154 (1994).   Duffey acknowledges that *Simmons* was not in effect at the time of his trial.   (Supreme Court held that *Simmons* announced a "new rule" of constitutional law. *O'Dell v. Netherland*, 521 U.S. 151 (1997)).   He further acknowledges that this Court must deny this claim subject to the bar on retroactive application of new legal rules to cases on collateral review unless the Commonwealth waives the application of *Teague*. *Teague v. Lane*, supra*; see also Frey v. Fulcomer*, 132 F.3d 916, 920 n.4 (1997) (Commonwealth can waive *Teague* and allow this court to address the *Simmons* claim on the merits.)

### State Court

The Pennsylvania Supreme Court addressed this issue in one paragraph.   At the time of Duffey's trial, *Simmons* had not been decided and the law in Pennsylvania prohibited juries from being instructed that "life means life." *Commonwealth v. Santiago*, 855 A.2d 682 (2004).   The court explained that "*Simmons* will not be given retroactive effect in a collateral attack upon a petitioner's sentence." *Laird*, 726 A.2d at 360.   Therefore, this issue did not entitle petitioner to relief. *Duffey-III* at 71.

### Analysis

In *Simmons*, the United States Supreme Court held that due process required the trial judge to inform the jury that the defendant would not have been eligible for parole if sentenced to imprisonment for life.  The plurality opinion endorsed by four Justices reasoned that:

> the jury reasonably may have believed that petitioner could be released on parole if he were not executed.  To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration.  This grievous misperception was encouraged by the trial court's refusal to provide the jury with accurate information regarding petitioner's parole ineligibility, and by the State's repeated suggestion that petitioner would pose a future danger to society if he were not executed.

*Simmons*, 512 U.S. at 161-62.  Due to the jury's speculation on parole eligibility, the plurality stated that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible."  *Id.* at 156.

It should be noted that the comments that Duffey complains of in this claim were actually made by defense counsel during closing argument at the sentencing hearing, not by the prosecution.  Accordingly, even if *Simmons* had been decided before his trial, Duffey has failed to show that the prosecution violated his rights. The *Simmons* plurality opinion shows that Justice O'Connor's controlling opinion

can be read more narrowly to hold that the rule governs only where the prosecution actually argues that a defendant poses a future threat. *Id.* at 177.

Further, and most importantly, defense counsel went on to argue "...society will be protected if [Duffey] gets life imprisonment. I must tell you, in Pennsylvania, life is life, no question of a parole." SCR 89 at 226 (Tr. of Penalty Phase, Feb. 7, 1985). The prosecution objected to this statement made by defense counsel and a sidebar was called for a discussion off of the record. No further comments were made to the jury in this regard. *Id.*

Therefore, it can aptly be argued there was no misperception by the jury whatsoever since Duffey's counsel stated that 'life is life without possibility of parole.' The statement stood uncontradicted. Further, it was Duffey's counsel, not the prosecution, who made the statement. Moreover, Duffey has failed to show that this claim is meritorious since he erroneously relies on the *Simmons* case as it was decided after his case was final and therefore not available to him. The Pennsylvania Supreme Court's decision on this issue is reasonable and not contrary to federal law. Accordingly, this claim fails.

**CLAIM V: Petitioner's death sentence should be vacated because the penalty-phase jury instructions said the jury should weigh the sole aggravating circumstance against each mitigating circumstance individually, rather than against the collective weight of the mitigating circumstances.**

Duffey next claims that the penalty phase jury instructions told the jury to weigh the sole aggravating circumstance against each mitigating circumstance individually, rather than against the collective weight of the mitigating circumstances. Duffey claims these instructions violated Pennsylvania law and the Eighth and Fourteenth Amendments of the United States Constitution by creating an unacceptable risk that the death penalty was imposed in spite of factors which called for a less severe penalty. In addition, Duffey pleads he is entitled to relief under the Sixth and Fourteenth Amendments because trial and appellate counsel were ineffective for failing to raise this issue at trial and on direct appeal. Duffey further argues this claim is the same as the one presented in *Commonwealth v. DeHart*, 650 A.2d 38 (1994) where the jury instructions were *written* incorrectly reflecting mitigating circumstance instead of circumstance<u>s</u>.

### State Court

The statute in operation at the time of Duffey's prosecution, 42 Pa.C.S. §9711(c)(1)(iv), required that "the verdict must be a sentence of death if the jury unanimously finds...one or more aggravating circumstances which outweigh any mitigating circumstances." The verbal instruction from the trial court that Duffey challenges is as follows:

71

"The crime [sic] code provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance *and no mitigating circumstance* or if the jury unanimously finds one or more aggravating circumstances which outweighs any mitigating circumstance.  That is what the law provides. The verdict must be life imprisonment in all other cases."  (emphasis added)

SCR 89 at 252 (Tr. of Penalty Phase, Feb. 7, 1985).  The trial court went on to

instruct the jury:

All the evidence from both sides, including the evidence you heard earlier during the first trial in the case in chief and to aggravating and mitigating circumstances, is important and proper for you to consider.
. . .
Remember and consider all of the evidence, giving it the weight to which it is duly entitled.
 . . .
Remember that your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstances or if you unanimously find one or more aggravating circumstance which outweighs any mitigating circumstance.  In all other cases, your verdict must be a sentence of life imprisonment.

*Id.* at 254-255.  The jury returned a death sentence for the first degree murder

conviction.  The jury found one aggravating circumstance, that Duffey committed

a killing while in the perpetration of a felony.[31]  The verdict slip did not indicate

---

[31]     *See* 42 Pa.C.S. § 9711. Sentencing procedure for murder of the first degree (d) Aggravating circumstances.-- Aggravating circumstances shall be limited to the following: (6) The defendant committed a killing while in the perpetration of a felony.

which of the proffered mitigating circumstances were found.[32]

By contrast, in *DeHart*, the written instruction was incorrect. The *DeHart* court reasoned that if a jury hears an instruction and it causes questions, they will ask the judge for clarification. However, if the written instructions are wrong, they will not ask for clarification interpreting a written instruction. Therefore, the possibility of a misconception is significantly enhanced. 650 A.2d at 48. In the matter *sub judice*, the written instructions on the verdict slip correctly communicated the law to the jury; the oral instructions did not since it omitted the last "s" on "circumstances." 42 Pa.C.S. § 9711(c)(1)(iv). This distinguishes Duffey from *DeHart*. *Duffey-III* at 70.

**Analysis**

It is significant that *DeHart* was decided almost ten years after Duffey's case. Since the case involved a statute that existed at the time of Duffey's conviction, the Pennsylvania Supreme Court analyzed the merits of the issue, rather than simply dismissing it on the basis of counsel's failure to anticipate a change in the law. *Duffey-III*, at 70 n.12.

---

[32]    Four mitigating circumstances proffered: 42 Pa.C.S. § 9711(e) Mitigating Circumstances. – Mitigating circumstances shall include the following: (2) The defendant was under the influence of extreme mental or emotional disturbance; (3) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired; (4) the age of the defendant at the time of the crime; and (8) any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

At no time did the trial court state that the aggravating circumstance was to be weighed against each and every mitigating circumstance individually, rather than against the collective weight of the mitigating circumstances.  The trial court judge simply omitted an "s" from the phrase "mitigating circumstance" in his verbal instruction.  Duffey argues that the omission of the "s" in the verbal instruction altered the entire meaning of the instruction.

In further instructing the jury, the trial court judge passed blank jury forms to each juror so that they could follow along as he read the entire verdict form to them.  SCR 89 at 256-257.  (Tr. of Penalty Phase, Feb. 7, 1985).  The jurors were properly instructed during that reading.  Duffey contends that the jury did not see the jury form (and the correct instructions), thereby availing themselves of the correct wording and meaning of the statute, until after they reached their decision. However, the trial judge's precautionary step of allowing the jury to read along on a blank verdict form as he charging the jury, would have alleviated any misconception the jury may have had in regard to the proper weighing of mitigation and aggravation and the circumstance, with or without the "s".  The jury never asked the trial court judge for clarification of this issue before reaching a verdict later that same day; therefore, it would appear that the instructions to the jurors were clear.

Duffey has failed to show that the *de minimus* misstatement during the verbal instruction of the law (i.e. omitting the "s") created a reasonable likelihood that the jurors would erroneously infer that the aggravating circumstance had to be weighed against each individual mitigating circumstance instead of the collective weight of the mitigating circumstances.  The trial court judge correctly read the jury verdict form and allowed the jurors to read the jury verdict form for themselves.  The Pennsylvania Supreme Court's ruling on this matter is not contrary to clearly established federal laws and therefore will not be disturbed.  Accordingly, this argument fails.

**CLAIM VI: Petitioner's death sentence should be vacated because it is tainted by victim impact evidence and argument and due to ineffective assistance of appellate counsel.**

Duffey claims that before the 1995 amendments to the sentencing statute, victim impact evidence and argument were inadmissible, and where a death sentence obtained in a sentencing hearing at which victim impact matters were introduced, it is illegal.  In support of his position, Duffey relies on the holding in *Commonwealth v. Fisher*, 681 A.2d 130 (Pa. 1996) (held victim impact evidence was not admissible under Pennsylvania's capital sentencing statute at the time of defendant's trial).

**State Court**

75

The Pennsylvania Court determined that Duffey overlooked the fact that not until *Fisher* was victim impact testimony determined to be inadmissible. *Commonwealth v. Bracey*, 795 A.2d 935 (2002).   *Fisher* was decided after Duffey's direct appeal was final, therefore, he cannot rely on that case to support claims made in a collateral appeal.  *Duffey-III* at 70.   Moreover, Duffey did not raise and preserve a challenge to victim impact evidence on direct appeal, therefore, he was not entitled to relief.  *Id.*

**Analysis**

As a general rule, the admission and exclusion of evidence is a matter within the discretion of the trial judge. *Commonwealth v. Krajci*, 424 A.2d 914, 917 (Pa. Super. Ct. 1981); *see also* Pa.R.E. 104.  An abuse of that discretion may be found if it appears that a trial judge admitted irrelevant evidence that was prejudicial to the accused, or evidence the probative value of which was outweighed by its prejudicial impact or its tendency to suggest decision on an improper basis.  *Id; see also Commonwealth v. Shain*, 471 A.2d 1246, 1248-9 (1984).

At the time of Duffey's trial, the pertinent part of the Pennsylvania Sentencing Code provided as follows:

> In the sentencing hearing, evidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed and shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d)

and (e).  Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d).

42 Pa.C.S. § 9711 (a)(2).  It is noteworthy that the statute does not address victim impact evidence.

At the time of Duffey's trial, the basic federal premise on the admissibility of victim evidence, as Justice Cardozo so eloquently stated, was "[j]ustice, though due to the accused, is due to the accuser also.  The concept of fairness must not be strained till it is narrowed to a filament.  We are to keep the balance true." *Snyder v. Massachusetts*, 291 U.S. 97 (1934).

The initial decision declaring "victim impact" testimony violative of the Eighth Amendment was *Booth v. Maryland*, 482 U.S. 496 (1987).  The *Booth* Court found that such evidence would be emotionally charged and thus, interfere with the reasoned decision making process required in capital cases.  *Id.* at 508-09.

Following *Booth*, the Supreme Court considered the question of whether the prosecutor could urge the jury in his closing statements to sentence a defendant to death on the basis of the personal characteristics of the defendant's victim.  *South Carolina v. Gathers*, 490 U.S. 805 (1989).  Analogizing the prosecutor's argument to the introduction of victim impact statements utilized in *Booth*, the Supreme Court found the prosecutor's argument improper as the victim's character was irrelevant to the circumstances of the crime.  *Id.*

77

Duffey's conviction was affirmed after *Booth,* but before *Gathers.* Appellate counsel did not raise issues regarding victim impact evidence being introduced at trial.   After Duffey's conviction, but before his PCRA Petition, the United States Supreme Court reversed its earlier position, essentially reversing *Booth* and *Gathers,* and declared that victim impact testimony did not violate the Eighth Amendment.  *Payne v. Tennessee*, 501 U.S. 808 (1991).

The Supreme Court found that the state had the right to present evidence to counter evidence presented by defendant.   The Supreme Court held that if the state chose to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment presented no *per se* bar.   A state could legitimately conclude that evidence about the victim, and about the impact of the murder on the victim's family, was relevant to the jury's decision as to whether or not the death penalty should be imposed.   There was no reason to treat such evidence differently than other relevant evidence.  *Id.* at 825.

In words that were ultimately discredited, the *Booth* Court stated:

[victim impact] evidence leads to arbitrary imposition of the death penalty.   In the majority of cases, and in this case, victim impact evidence serves entirely legitimate purposes.   In the even that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.   Courts have always taken into consideration the harm done by the defendant in imposing sentence, and the evidence

78

adduced in this case was illustrative of the harm caused by Payne's double murder.  For [these] reason[s] . . . we now reject the view – expressed in *Gathers* – that a state may not permit the prosecutor to similarly argue to the jury the human costs of the crime of which the defendant stands convicted."

*Id.* at 825, 827 (internal citation omitted).

In 1995, the Pennsylvania Legislature modified the Pennsylvania statute to specifically include victim impact evidence:

In the sentencing hearing, *evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible*.  Additionally, evidence may be presented as to any other matter that the court deems relevant and admissible on the question of the sentence to be imposed. Evidence shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e), *and information concerning the victim and the impact that the death of the victim has had on the family of the victim.* Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d).

42 Pa.C.S. § 9711(a)(2).  (emphasis added).  It was not until after this change or clarification of the statute that the Pennsylvania Supreme Court announced that under the strict reading of the former statute (the one in effect at the time of the trial), victim impact evidence was not admissible.  *Commonwealth v. Fisher*, supra. By the time the Pennsylvania courts announced this interpretation, the statute had already been changed to specifically reflect the inclusion of victim impact evidence.  Since *Fisher* issued after Duffey's final appeal, general rules of

evidence were followed.

The long standing rule, held in both federal and Pennsylvania courts, is that evidence is admissible within the discretion of the court.  Although victim impact evidence was briefly forbidden (i.e. *Booth*, *Gathers* and *Fisher*) these cases were all decided *after* Duffey's trial.  Since Duffey's sentence became final, both the federal and state court have amended their positions to again permit the use of victim impact evidence.

"The United States Constitution provides that "no State shall . . . pass any . . . *ex post facto* Law. . . ." U.S. Const. Art. 1, § 10.  The Pennsylvania Constitution provides that "*no ex post facto* law. . . shall be passed." Pa. Const. Art. 1, § 17. The Pennsylvania Constitution provides the same *ex post facto* protections as the United States Constitution."  *Commonwealth v. Fisher*, supra.  Analysis of Duffey's federal *ex post facto* claim encompasses his state claim.  *Commonwealth v. Young*, 637 A.2d 1313 n.7 (Pa. 1993), cert. denied, 511 U.S. 1012 (1994).  Since there is no appreciable difference between the two constitutional provisions, or the Courts' analyses thereof, we will refer to them collectively as the "*Ex Post Facto* Clause." *Commonwealth v. Davis*, 760 A.2d 406 (Pa. Super. Ct. 2000).

The United States Supreme Court has defined *ex post facto* law as:

(1) Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such

action. (2) Every law that aggravates a crime, or makes it greater than it was, when committed.  (3) Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.  (4) Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Calder v. Bull*, 3 U.S. 386 (1798).  In order for a law to violate the *Ex Post Facto* Clause of U.S. Const. Art. I, § 10, a law must be retrospective - that is it must apply to events occurring before its enactment - and it must disadvantage the offender affected by it by altering the definition of criminal conduct or increasing the punishment for the crime.  *Collins v. Youngblood*, 497 U.S. 37 (1990).  The United States Constitution does not prohibit every retrospective law that alters a party's situation to his disadvantage.  *Id.*

Admission of victim-impact evidence in capital penalty trial, under statutory amendments allowing such evidence, to defendants whose offenses predated amendments did not violate federal *ex post facto* prohibition.  U.S.C.A. Const. Art. 1 § 10, Cl. 1; *see also Hopt v. Utah*, 110 U.S. 574 (1884); *Neill v. Gibson*, 278 F.3d 1044 (10th Cir. Okla. 2001), cert denied, 537 U.S. 835 (2002).  Such evidence does not lower the State's quantum of proof necessary to obtain the death penalty, and any tipping of balance in favor of State is not unfair.  *Hopt*, 110 U.S. at 589.

Statutes which simply enlarge the class of persons who may be competent to

testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do not attach criminality to any act previously done, and which was innocent when done; nor aggravate any crime theretofore committed; nor provide a greater punishment therefor than was prescribed at the time of its commission; nor do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed. *Id*.

With that standard in mind, we examine the 1995 amendment to Pennsylvania's statute 42 Pa.C.S. § 9711(a)(2), which explicitly permits the admission of victim-impact evidence. Nothing about the amendment lowers the quantum of proof necessary for the state to obtain a sentence of death. The state must prove each issue submitted to the jury beyond a reasonable doubt, just as Pennsylvania law previously required it to do. Although the retroactive application of a change in the law that permits the state to introduce a new kind of evidence against a defendant might tip the balance in favor of the state, it does not "unfairly" tip it for purposes of the federal *Ex Post Facto* Clause, as does a change in the law that reduces the sufficiency of the evidence standard. *Carmell*, 529 U.S. at 533. (Ordinary rules of evidence do not violate the *Ex Post Facto* Clause). *Hopt v. Utah*, 110 U.S. at 589 (1884). (Law was not *ex post facto* because it neither made

82

criminal a theretofore innocent act, nor aggravated a crime previously committed, nor provided greater punishment, not changed the proof necessary to convict.)

The *Carmell* Court observed that rules which permit evidence to be admitted at trial, whether one-sided or not, "... do not at all subvert the presumption of innocence, because they do not concern whether the admissible evidence is sufficient to overcome the presumption. Therefore, to the extent one may consider changes to such laws as 'unfair' or 'unjust,' they do not implicate the same kind of unfairness implicated by changes in rules setting forth a sufficiency of the evidence standard." (emphasis in original). *Carmell* 529 U.S. at 533. In *Thompson v. Missouri*, 171 U.S. 380 (1898), the defendant's murder conviction was reversed by the Missouri Supreme Court because of the inadmissibility of certain evidence. Prior to his retrial, the law was changed to make the evidence admissible and the defendant was again convicted. The Court held that this change was procedural and not violative of the *Ex Post Facto* Clause. *Id*.

It is well to note that even if Duffey were to obtain relief on this point, and afforded a new sentencing hearing, victim impact evidence *would be admissible*. Therefore, the very thing Duffey complains of could be before the jury in a new sentencing hearing. Accordingly, the admission of victim-impact evidence against Duffey under the 1995 amendment to 42 Pa.C.S. § 9711(a)(2) does not violate the

*Ex Post Facto* Clause of the United States Constitution.  Since we find that the admission of the victim impact evidence did not violate Duffey's due process rights under the Constitution, and any re-sentencing would allow the admission of victim impact evidence, we need not address whether counsel was ineffective for not arguing this on appeal.  Accordingly, this claim fails.

**CLAIM VII: Petitioner's death sentence should be vacated because three potential jurors were improperly dismissed in violation of *Witherspoon v. Illinois* and its progeny.**

Duffey next contends that his death sentence is unconstitutional because three potential jurors were improperly excluded for cause when they voiced reservations about the death penalty.  Duffey claims this violated his constitutional rights as delineated in *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and its progeny.  Of these venirepersons, Ms. Mark and Ms. Judge were dismissed for cause over defense counsel's objection.  Ms. Walters was dismissed for cause and counsel did not object.  Direct appeal counsel did not raise *Witherspoon* errors as to all three.  Duffey claims his Sixth and Fourteenth Amendment rights were violated by these errors at trial and by ineffective assistance of trial and appellate counsel.  After filing his *habeas* petition, Duffey withdrew his *Witherspoon* claims with respect to Ms. Mark and Ms. Judge, but continues his claim as to Ms. Walters.  *See* Dkt 117 at 56 n.22.

### State Court

After reviewing the relevant testimony, the Pennsylvania Supreme Court found no merit to the *Witherspoon* claims.   Jurors Mark and Judge were substantially impaired and were properly stricken for cause. *Duffey-II* at 771.   As to juror Walters, the Pennsylvania Supreme Court found her to be somewhat unclear as to her convictions regarding imposition of the death penalty, and these concerns could have substantially impaired her ability to function as an impartial juror. *Id.*   The trial court was in the best position to make that determination. Therefore, the Pennsylvania Supreme Court could not say the trial judge abused his discretion in dismissing this prospective juror. *Id.*   Duffey failed to demonstrate that trial counsel was ineffective for failing to object to dismissal of juror Walters and, therefore, the claim against trial counsel fails.   Since this was a layered claim, and trial counsel was found not to be ineffective, the claim against direct appellate counsel also fails. *Id.*

### Analysis

In *Witherspoon,* the Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.   No defendant

can constitutionally be put to death at the hands of a tribunal so selected."  391

U.S. at 522-23.  *Witherspoon* is grounded in the right to a fair and impartial jury

guaranteed to state criminal defendants by the Sixth and Fourteenth Amendments.

*Id.*

   As with the case *sub judice*, the jury in *Witherspoon* was entrusted with two

distinct responsibilities:  first, to determine innocence or guilt; and if guilty, to

determine the sentence.  The court held that while there was no *per se* rule that

would invalidate the conviction, the jury's impartiality as to sentencing was

inadequate because of these excluded jurors.  *Id.* at 518.  Where the prosecutor was

allowed to eliminate every venireman who expressed any reservations about the

death penalty, the state crossed the line of neutrality, producing a jury that is more

willing to sentence to death.  To execute the prisoner would have deprived him of

his life without due process of law.  *Id.* at 520-21.  A man who opposes the death

penalty, no less than one who favors it, can make the discretionary judgment

entrusted to him by the State and can thus obey the oath he takes as a juror.  *Id.* at

519.

   The *Witherspoon* test was further clarified by the United States Supreme

Court in *Wainwright v. Witt*, 469 U.S. 412 (1985).  The Court held that the proper

standard for excluding jurors opposed to capital punishment was set forth in a later

case, *Adams v. Texas*, 448 U.S. 38 (1980).  In *Adams,* the Court discussed its prior opinions dealing with juror exclusion and instead of strictly applying the *Witherspoon* test, the *Adams* Court concluded:

> This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the Court.

*Adams*, 448 U.S. at 45; *see also Witt*, 469 U.S. at 424.

If "prospective jurors are barred from jury service because of their views about capital punishment on any broader basis than inability to follow the law or abide by their oaths, the death sentence cannot be carried out."  *Adams*, 448 U.S. at 47-48; *Szuchon v. Lehman*, 273 F.3d 299 (3d Cir. 2001).

The precedents established by these cases set forth four basic principles. First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause.  *Witherspoon*, 391 U.S. at 521.  Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes.  *Witt*, 469 U.S. at 416.  Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the

death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. *Id.* at 424. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts. *Id.* at 424-434.

"When an adversary wishes to exclude a juror because of bias. . . it is the adversary seeking exclusion who must demonstrate, through questions, that the potential juror lacks impartiality." *Id*. at  423.   After the adversary offers its challenge for cause, "it is then the trial judge's duty to determine whether the challenge is proper." *Id*.  A trial judge's finding under this standard is a factual determination and it is therefore entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). *Martini v. Hendricks*, 348 F.3d 360, 363 (3d Cir. 2003), cert. denied, 543 U.S. 1025 (2004).  This presumption of correctness is rebuttable only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Deference is owed to the finding of bias the trial court makes during the *voir dire* proceeding. *Uttecht v. Brown*, 551 U.S. 1, 7 (2007).  Deference is owed regardless of whether the trial court engages in explicit analysis or an implicit finding of bias. *Witt*, 469 U.S. at 430.

"Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Uttecht*, 551 U.S. at 9 (citations omitted). The judgment as to whether a venireman is biased "...is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations [are] entitled to deference even on direct review; the respect paid such findings in a habeas proceeding certainly should be no less." *Witt*, 469 U.S. at 428*; see also Stevens v. Beard*, 701 F. Supp. 2d 671, 718 (W.D. Pa. 2010).

In the present matter, Ms. Walter faltered in her responses, and the prosecutor even commented on her ambiguity in order to make a point in the written record.

> Q. If we prove the Defendant guilty beyond a reasonable doubt, would you in a sense come back and say, yes, the Commonwealth has indeed met its burden of proving the Defendant guilty as charged and I would find him guilty. Would you so find him guilty if we met our burden and proved our case?
>
> A. Yes.
>
> Q. Is there just a bit of hesitation?
>
> A. Yes.
>
> Q. Okay, and tell me what it is.

A.  I don't know if I could give the death penalty.

Q.  You don't think you could deal with the death penalty?

A.  Deal with it.

Q.   Let me ask you a few questions about that.  Do you have any moral, religious, or conscientious objections to the death penalty as you're sitting here thinking about it now?

A.  I guess moral.

Q.  Are you a Catholic?

A. Yes.

Q.  Is it part of your upbringing - -

A.  No.

Q.  Just the way you evaluate your sense of values?

A. Yes.

SCR 92 at 199-201. (Tr. of Voir Dire, Vol VII, Jan.  29, 1985). Ms. Walters later indicated that she could follow the judge's instructions; however, the written record does not reflect the demeanor or conviction in which she answered these questions.   The prosecutor challenged Ms. Walters for cause, and the record reflects no objection from defense counsel.   By granting the prosecutor's challenge, the judge implicitly found bias.  A finding of bias may be upheld even in the absence of clear statements from the juror since "many veniremen simply

cannot be asked enough questions to reach the point where their bias has been made unmistakably clear." *Witt*, 469 U.S. at 424.   Therefore, when there is an ambiguity in a prospective juror's statements, the determination of bias is entitled to be resolved in favor of the State." *Id.* at 434.

In *Stevens*, the court further reflected that not only is deference to be given to the trial court regarding the dismissal of a juror, weight must also be given to defense counsel's failure to object.   *Stevens*, 701 F. Supp. 2d at 720.   In the present matter, the failure of defense counsel to object is critical and ultimately telling.   It may indicate acquiescence of the implicit finding of bias, or it may indicate a tactical decision that the juror was otherwise favorable to the defense, or perhaps an attempt to introduce an error into the trial. Whatever the reason, failure to object to the prosecution's challenge is considered a waiver under Pennsylvania law.  Pa. R. Crim. P. 631 (formerly Pa. R. Crim. P. 1106).

In general, issues not raised in the trial court will not be considered for the first time on appeal.   It is the purpose of this general rule to give the trial court an opportunity to correct the alleged error.   Accordingly, it is the duty of counsel to call the trial court's attention to the alleged error.   In *United States v. Socony-Vacuum Oil Co.*, the Supreme Court held that "counsel for the defense cannot as a rule remain silent, interpose no objections, and after a verdict has been returned

seize for the first time" on a claim of error.  310 U.S. 150 (1940).  This rule serves several important functions.  A timely objection allows the trial court and the prosecutor to reconsider, and perhaps change, their course of conduct while still possible.  If the defendant is successful, he avoids prejudicial error.  Even if he is convicted, his timely objection delineates the points that may be appealed and avoids unnecessary reversals because of errors that could have been averted at trial. *See United States v. Somers,* 496 F.2d 723, 742 (3d Cir. 1974), cert. denied, 419 U.S. 832 (1974).  Raising a timely objection also aids review on appeal because the trial court makes a timely record of the claim while the parties' recollections are still fresh.  *See Gass v. United States*, 416 F.2d 767, 775-76 (D.C. Cir. 1969); *United States v. Indiviglio*, 352 F.2d 276, 280 (2d Cir. 1965) (en banc), cert. denied, 383 U.S. 907 (1966).

Capital defendants have the right to be sentenced by an impartial jury.  The State may not infringe upon this right by eliminating from the jury those whose scruples against the death penalty would not substantially impair or prevent them from performing their duty.  Courts reviewing claims of *Witherspoon-Witt* errors owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror.  Such deference is more paramount when federal courts are considering *habeas* petitions within the

framework of AEDPA.  The decision of the trial court to find bias in Ms. Walters was not contrary to or an unreasonable application of clearly established federal law.  This conclusion is supported by a reading of the transcript, observing the deference owed to the state courts under the AEDPA, and the fact that Duffey's counsel did not object to the prosecutor's challenge and the subsequent removal of Ms. Walters.  Because Duffey has failed to show by clear and convincing standard that the trial court abused its discretion, we will not disturb the court's finding of bias.  Accordingly, this claim fails.

**CLAIM VIII: Petitioner's conviction and death sentence should be vacated because the jury was not fair and impartial.**

Duffey next claims that the inclusion of juror Richard Fagerlin ("Fagerlin") on the jury violated his Sixth and Fourteenth Amendment rights to a fair and impartial jury.  *See Ross v. Oklahoma*, 487 U.S. 81, 85 (1988) (citations omitted). Further, Duffey claims that seating Fagerlin violated his Eighth Amendment right to a reliable and individualized capital sentencing proceeding since Fagerlin would vote for death in every murder case.  *See Woodson v. North Carolina*, 428 U.S. 280 (1976) (plurality) (indicating that imposition of a death sentence for all murders does not allow for individualized sentencing that considers mitigating factors). Duffey further claims that his trial counsel was ineffective for failing to strike Mr. Fagerlin for cause, failing to use a peremptory strike against this juror, and that

93

appellate counsel was also ineffective for failing to raise this issue on appeal.

### State Court

Duffey highlights portions of Fagerlin's statements during voir dire: "The way I feel, if a man commits a murder – a crime – he should be put to death." SCR 92 at 175. (Tr. of Voir Dire, Vol. VI, Jan. 22, 1985). "If the person did it, and he is found guilty, I believe he should" receive the death penalty. *Id.* at 164-65. Duffey further claims that Fagerlin never stated that he could overcome his belief and apply the court's sentencing phase instructions; instead, he stated only that he would "try." *Id.* at 178. When initially asked whether he would not draw adverse inferences if Duffey failed to testify, Fagerlin stated "I don't know. I can't answer that." *Id.* at 180-182. Upon further questioning Fagerlin stated he "guess[ed]" he could return a not guilty verdict. *Id.* at 179. *Duffey-II* at 771.

The Pennsylvania Supreme Court found that when Fagerlin's *entire* testimony was read in context, it was evident that seating him was not improper:

> Fagerlin repeatedly indicated that he could follow the judge's instructions. SCR 92 at 176-182. At the PCRA hearing, trial counsel recalled that he believed that Fagerlin would be a fair and impartial juror and that he impressed counsel as someone who was "deliberate" and "thoughtful," not one to make a "snap judgment;" "someone who was really going to listen very carefully." SCR 151 at 42-43. (Tr. of PCRA Dec. 17, 1999). Trial counsel further believed that Fagerlin made an earnest effort, noting that "I'll try, I really will," not just saying "I'll try."

*Duffey-II* at 770.

**Analysis**

In this claim, Duffey challenges the seating of a juror, rather than the dismissal of a juror, as was the issue in the prior claim.  Many of the cases are the same as to both claims, as well as the deference afforded to the state court.  With that in mind, we will address this claim.

The Sixth and Fourteenth Amendments guarantee a defendant the right to a trial by an impartial jury.  *Ross v. Oklahoma*, supra. "The proper standard for determining when a prospective juror may be excused for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  *Witt*, 469 U.S. at 424.  A juror who in no case could vote for capital punishment is not an impartial juror and must be removed for cause. *See Witherspoon*, 391 U.S. at 523 n.21.  Conversely, the Supreme Court has held that a juror who will automatically impose the death penalty upon conviction is necessarily unable to deliberate impartially in accordance with the law and his oath.  *Morgan v. Illinois*, 504 U.S. 719 (1992)*; see also Woodson v. North Carolina*, supra.

In *DeShields v. Snyder*, the Court concluded with respect to Juror "B":

> [A]lthough initially responding that he would impose the death
> sentence if the jury returned a verdict of first degree murder, later
> indicated that he could follow the instructions of the Court and impose
> either a life sentence or a death sentence.  In Ross, the Court found
> that a person can go from giving an equivocal response to giving an
> unconstitutionally unequivocal response, just as a juror goes from
> giving an impermissible response to clarifying it into a
> constitutionally appropriate response. Ross, 487 U.S. at 83-85. Thus,
> the fact that JUROR "B" initially indicated that he would
> automatically vote for the death penalty is not a sufficient ground to
> support DeShields' *habeas* claims. The record is clear that after
> clarification of the relevant question by the Court and further
> questioning, JUROR "B" indicated an ability to be impartial, follow
> the instructions of the court and impose a sentence within those
> allowed by law that he felt appropriate. The views of JUROR "B"
> cannot be said to be such that they would "prevent or substantially
> impair the performance of his duties as a juror in accordance with 'his
> instructions and his oath."

829 F. Supp. 676, 690-91 (D. Del. 1993) citing *Witt*, supra.

As with any other trial situation where an adversary wishes to exclude a

juror because of bias, then, it is the adversary seeking exclusion who must

demonstrate, through questioning, that the potential juror lacks impartiality.  *See*

*Reynolds v. United States*, 98 U.S. 145, 157 (1879); *see also Witt*, supra.

Of some note is the language Duffey's counsel used when questioning Fagerlin:

Fagerlin:     The only thing I can say is, I'll try my best.

Defense:     I can't ask you to do more than that.
. . .

Defense:     You would try?

96

Fagerlin:     Yes, I would try.

SCR 92 at 180 (Tr.  of Voir Dire, Vol. IV, Jan.  22, 1985).

Since we did not observe the voir dire, we cannot give weight to Fagerlin's demeanor or conviction in his responses.  Duffey's counsel used the term "try"and Fagerlin used the same term in response.  If, at any time, the trial court judge or any counsel was unsure of how to interpret the term "try," they could have asked additional questions to better clarify Fagerlin's position.  Because they did not, it is very likely that the trial court judge and counsel were comfortable with Fagerlin's conviction to follow the judge's instructions and his oath as a juror, otherwise, trial counsel could have objected.  Again, as in the last claim, there is nothing in the transcript, nor has Duffey shown, that trial counsel did not have a reasonable basis for his actions.

The federal court does not sit as a super appeal court for state convictions.  Instead, in *habeas corpus* review, it sits to review state court determinations to make sure they are not violative of the Constitution and clearly established federal law.  The Supreme Court has admonished reviewing courts to defer to the trial court's resolution of questions of bias arising from a potential juror's conflicting voir dire answers because the trial court had the opportunity to observe the demeanor of the potential juror. *Uttecht*, 551 U.S. at 22.  ("Where, as here there is

a lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful voir dire, the trial court has broad discretion.  Courts reviewing claims of *Witherspoon-Witt* error, however, especially federal courts considering *habeas* petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror.") *Id.* at 19.

Under the AEDPA, Duffey may obtain relief only upon showing that the trial court's conclusion is "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2). Thus, we presume the Pennsylvania court's factual findings to be sound unless Duffey rebuts the "presumption of correctness by clear and convincing evidence" that the decision is clearly erroneous.  § 2254(e)(1).  The standard is demanding but not insatiable, deference does not by definition preclude relief." *Miller-El*, 537 U.S. at 340 (2003).

Duffey has failed to meet his burden of showing by clear and convincing evidence that the trial court's decision to permit Fagerlin to remain on the jury was an unreasonable determination of the facts in light of the evidence presented. While Fagerlin initially stated that he would find for the death penalty in all cases, upon being instructed on the standard, Fagerlin repeatedly stated he would be able

to follow the law and follow the judge's instructions.  Therefore, we agree with the Pennsylvania Supreme Court's conclusion regarding Fagerlin.  Duffey has failed to establish that Fagerlin was seated in violation of his Sixth, Eighth and Fourteenth Amendment rights.  Therefore, this claim fails.

## CLAIM IX: Petitioner's death sentence should be vacated because of ineffective assistance of direct appeal counsel.

Duffey's final claim addresses the ineffective assistance of direct appeal counsel only.  He alleges that several constitutional errors occurred during the sentencing hearing.  Specifically, he states that direct appeal counsel never read the transcript of the capital sentencing hearing and, therefore, failed to raise these issues on direct appeal.  In the same vein, he contends that it is deficient performance for an appellate counsel to not review the transcript of the sentencing hearing in a capital case.

### Analysis

It is worth noting that Duffey admits in his PCRA appeal to the Pennsylvania Supreme Court that claims of ineffective assistance of counsel at the penalty phase of a capital trial are usually litigated at the PCRA hearing, not on direct appeal.  Dkt 130-4 at 55 (Initial Brief of Appellant).

> Appellant's counsel recognize that this is the normal process for review of penalty–phase ineffectiveness claims in Pennsylvania and that typically, therefore, direct appeal lawyers do not raise penalty-

99

> phase ineffective assistance claims. Appellant's counsel also recognize that this is usually the case because the mitigating evidence that a sentencing lawyer fails to develop is, for obvious reasons, usually not included in the record certified to this Court on direct appeal. (Footnotes and citations omitted).

*Id.* Yet in his *habeas* petition to this court, Duffey attacked direct appeal counsel for not addressing these very issues on direct appeal and for not reading the transcript at sentencing.

It appears that Duffey added this stand alone claim to his petition as a last ditch effort to attack his direct appeal counsel. Duffey uses the PCRA Court's finding of ineffective assistance of direct appeal counsel as to Claim II, supra, to support his argument in this claim. Duffey addresses this claim in less than one page of his petition and in only one paragraph in his memorandum of law. (Dkt 91 and 117, respectively.) Yet, he adds no additional information or argument than what has already been addressed in Claim II. Since there is nothing more for us to address in this claim than what has already been addressed in Claim II, supra, and because that claim failed, this claim fails as well.

## V.     CONCLUSION

For the foregoing reasons, Duffey's petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 shall be denied. An appropriate order shall issue.

101